# Case No. <u>26-5040</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

Linh Tran Stephens, owner of LINH TRAN STEPHENS©™ and of G.L.S©®,
and LINH TRAN STEPHENS©™
*Plaintiffs–Appellants*,

v.

STATE OF OKLAHOMA; OKLAHOMA DEPARTMENT OF
HUMAN SERVICES; et al.,
*Defendants–Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
D.C. No. 4:25-CV-00286-CVE-MTS (Hon. Claire V. Eagan)

---

## *VERIFIED* COMBINED OPENING BRIEF AND
## APPLICATION FOR A CERTIFICATE OF APPEALABILITY

---

*WITHOUT RECOURSE, without prejudice*
By: Linh Tran Stephens / attorney-in-fact and
one-and-only Authorized Agent and secured party creditor
of LINH TRAN STEPHENS©™,
sui juris, natural living woman
breathing with a soul and Holy Spirit,
**in care of:** 235 Tom Stewart Rd,
Newberry, South Carolina 00000
ZIP EXEMPT [near 29108]
without the United States District of Columbia
Telephone: (843) 608-0294
Email: linhstephens7@gmail.com

June 26, 2026

# TABLE OF CONTENTS

Table of Authorities ………………………………………………..……… ii-iii

Statement of Related Cases ………………………………………………… iv

Jurisdictional Statement ……………………………………………………… iv

Statement of the Issues ……………………………………..………………… 1-2

Statement of the Case ……………………………………………..………… 2

Statement of Facts (See also Exhibit A: "VERIFIED DECLARATION OF LINH TRAN STEPHENS," executed pursuant to 28 U.S.C. § 1746) ……………..……… 3

Standard for a Certificate of Appealability …………………………………..… 5

Summary of Argument …………………………………………………….…... 6

Argument ……………………………………………………………………… 7

    **I.** The State Violated Appellant's First Amendment Rights -- to Petition the Courts for Redress, to Free Speech, and to the Free Exercise of Religion -- Acting Under Color of Law in Both Individual and Official Capacities ……….7

    **II.** Administrative Abuse "Substantiation," Imposed Without Any Hearing, Deprived Appellant of a Protected Liberty Interest Without Due Process ….. 12

    **III.** Severing the Parent-Child Relationship for Years Without a Meaningful Hearing Violated Due Process ………………………………..……….. 13

    **IV.** Fabrication or Misrepresentation of Evidence by a Caseworker Violates Due Process ………………………………………………………… 18

    **V.** Jurisdictional Dismissal Is Debatable, and the § 1983 Claims Should Not Have Been Barred ……………………………………….…………...… 20

    **VI.** The Presiding Judge's Admitted Financial Relationship With the Court-Appointed Guardian ad Litem Denied Appellant an Impartial Tribunal.25

    **VII.** Reservation of Issues and Magistrate Objection ………….…………... 26

Relief Sought …………………………………………………………… 27

AVOUCHMENT / VERIFICATION …………………………………..……… 30

Notary as JURAT CERTIFICATE …………………………………………... 31

Certificate of Compliance ……………………………………………………… 32

Certificate of Service ……………………………………………………… 33

Attachment 1: District Court Order and Judgment of Dismissal (01-22-2026) (ROA 193−197) ……………………………………………………………………34

Attachment 2: District Court Order Granting Motion to Reopen Time to Appeal (05-19-2026) (ROA 205, 319) ……...…………………………………………41

Attachment 3: District Court Order Denying Leave to Proceed In Forma Pauperis on Appeal (05-19-2026) (ROA 319–320) ……………………………………50

Exhibit A: Verified Declaration of Linh Tran Stephens ……………………… 52-62

---

## TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) ……………………………………26

*Ankenbrandt v. Richards, 504 U.S. 689 (1992)* …………………………………..23

*Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011)* ………………………..…..8

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872, 877 (2009) ………....25, 26

*California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)* …….8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)* ..11

*Costanich v. Dep't of Social & Health Servs., 627 F.3d 1101 (9th Cir. 2010)* …7, 19

*DeBardeleben v. Quinlan, 937 F.2d 502 (10th Cir. 1991)* …………………..…..25

*Dennis v. Sparks, 449 U.S. 24 (1980)* …..…………………………………………11

*Dupuy v. Samuels, 397 F.3d 493 (7th Cir. 2005)* …..…………………………….12

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) …………………………………..…..22

*Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005)* ….......22

*Gomes v. Wood, 451 F.3d 1122 (10th Cir. 2006)* ………………....….6, 14, 16, 17, 23

*Gonzalez v. Trevino, 602 U.S. 653 (2024)* ..…………………………………….....9

*Gwinn v. Awmiller, 354 F.3d 1211 (10th Cir. 2004)* ..…………………………….12

*Hafer v. Melo, 502 U.S. 21 (1991)* ..……………………………………………….11

*Haines v. Kerner,* 404 U.S. 519, 520–21 (1972) …………………………….…..22

*Hartman v. Moore, 547 U.S. 250 (2006)* ……………………………………….….9

*Hollingsworth v. Hill, 110 F.3d 733 (10th Cir. 1997)* ..…………………………...6, 14

*In re Murchison, 349 U.S. 133 (1955)* ………………………………………….….25

*Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502 (1982)* …………………………………………………………………..1, 2, 7, 20, 21, 22

*Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982)* ..…………………………….11

*Malik v. Arapahoe County Dep't of Social Servs., 191 F.3d 1306 (10th Cir. 1999)* …..…………………………………………………………..6, 14, 19, 23

*Mathews v. Eldridge, 424 U.S. 319 (1976)* ………………………………….....…14

*Miller-El v. Cockrell, 537 U.S. 322 (2003)* ..………………………………………5

*Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977)* …..…………………..9

*Nieves v. Bartlett, 587 U.S. 391 (2019)* ..…………………………………………9

*Parham v. J.R., 442 U.S. 584 (1979)* ……………………………………….…..14

*Paul v. Davis, 424 U.S. 693 (1976)* ..………………………………………....…6, 12

*Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir. 2004)* …………………………...19, 23

*Pierce v. Society of Sisters, 268 U.S. 510 (1925)* ..……………………………..…10

*Roberts v. United States Jaycees, 468 U.S. 609 (1984)* ..…………………………11

*Roman-Nose v. New Mexico Dep't of Human Servs., 967 F.2d 435 (10th Cir. 1992)* ..…………………………………………………1, 2, 7, 20, 21, 22

*Roska ex rel. Roska v. Peterson, 328 F.3d 1230 (10th Cir. 2003)* ………...…6, 14, 23
*Santosky v. Kramer, 455 U.S. 745 (1982)* ……………………………...…6, 13
*Slack v. McDaniel, 529 U.S. 473 (2000)* ……………………………….....5, 20
*Stanley v. Illinois, 405 U.S. 645 (1972)* …...………………………....…6, 13
*Troxel v. Granville, 530 U.S. 57 (2000)* …………………………….6, 13
*Tumey v. Ohio*, 273 U.S. 510, 532 (1927) …………………………….25, 26
*United States v. Raddatz, 447 U.S. 667 (1980)* ……………………………..…27
*Valmonte v. Bane, 18 F.3d 992 (2d Cir. 1994)* ………………………...…12
*Wisconsin v. Constantineau, 400 U.S. 433 (1971)* ………………………...…6, 12
*Wisconsin v. Yoder, 406 U.S. 205 (1972)* …………………………….....…10
*Withrow v. Larkin*, 421 U.S. 35, 47 (1975) …………………………….25
*Younger v. Harris*, 401 U.S. 37 (1971) …………………………….23, 24

**Constitutional Provisions**

U.S. Const. amend. I ……………………………………… 1, 4, 7, 8, 9, 10, 11, 16
U.S. Const. amend. IV …………………………………………………… 19
U.S. Const. amend. V …………………………………………………… 43
U.S. Const. amend. XIV ……………………………………… 10, 12, 14, 19, 28

**Statutes and Rules**

10th Cir. R. 22.1 …………………………………………………….iv
28 U.S.C. § 1291 ……………………………………………….iv, 22
28 U.S.C. § 1331 ……………………………………………….23
28 U.S.C. § 1651 ……………………………………………….iv, 2
28 U.S.C. § 1746 ……………………………………………….3, 30, 34, 43
28 U.S.C. § 2241 ……………………………………………….iv, 2
28 U.S.C. § 2253 ……………………………………………….iv, 5
28 U.S.C. § 636 …………………………………………………….27
42 U.S.C. § 1983 ……………………………….iv, 1, 2, 6, 7, 11, 20, 21, 22, 23, 24, 27
42 U.S.C. § 671(a)(15) …………………………………………………….17
42 U.S.C. § 672(a)(2) …………………………………………………….17
45 C.F.R. § 1356.21 …………………………………………………….17
Fed. R. App. P. 4 / 4(a)(6) …………………………………………iv, 2, 22, 24
Fed. R. App. P. 25(a)(5) ………………………………………………...…iv
Fed. R. App. P. 32 / 32(a)(5)-(6) …………………………………………… 1, 31
Fed. R. App. P. 60 …………………………………………………….2
Okla. Stat. tit. 43, § 551-203 …………………………………………………….15
O.R.S. § 109.701 et seq. …………………………………………………….15

**STATEMENT OF RELATED CASES**

A companion appeal, No. 26-5041 (D.C. No. 4:25-CV-00285-GKF-MTS), challenging Appellant's incarceration for contempt over unvalidated child support, is pending before this Court. Prior appeals include Nos. 24-5138 and 25-5063. Related state proceedings include Tulsa County Case No. JD-2021-270, which was non-consensually consolidated into No. FD-2015-2228 over Appellant's active objections. The center of this appeal is G.L.S., Appellant's firstborn female offspring and inheritance from YAHUAH. Pursuant to Fed. R. Civ. P. 5.2 and Fed. R. App. P. 25(a)(5), the minor is identified by her initials, G.L.S.

**JURISDICTIONAL STATEMENT**

Appellant invoked the district court's jurisdiction under 28 U.S.C. §§ 2241 and 1651 and under 42 U.S.C. § 1983. The district court entered final judgment dismissing the petition on January 22, 2026. Appellant timely sought to reopen the time to appeal, which the district court granted under Fed. R. App. P. 4(a)(6) on May 18, 2026. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253. To the extent the petition sounds in habeas, Appellant seeks a certificate of appealability under 28 U.S.C. § 2253(c) and 10th Cir. R. 22.1; to the extent it states claims under 42 U.S.C. § 1983, no certificate is required and review proceeds as of right under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether reasonable jurists could debate that state actors violated Appellant's First Amendment rights to petition, free speech, and free exercise of religion by obstructing court access and retaliating against her protected maternal advocacy.

2. Whether reasonable jurists could debate that an administrative abuse "substantiation"—imposed without a hearing, witness confrontation, or neutral decision-maker—deprived Appellant of a protected liberty interest without due process.

3. Whether reasonable jurists could debate that the long-term removal and forced separation of Appellant from her offspring (G.L.S.) without a meaningful evidentiary hearing violated due process.

4. Whether reasonable jurists could debate that a caseworker's fabrication or misrepresentation of investigative evidence, directly refuted by objective photographic, video, and professional witness evidence, violated due process.

5. Whether the district court's jurisdictional dismissal under *Lehman* and *Roman-Nose* is debatable, and whether Appellant's standalone 42 U.S.C. § 1983 civil rights claims should have been severed and permitted to proceed rather than improperly barred.

6. Whether reasonable jurists could debate that the presiding judge's admitted financial relationship with the court-appointed guardian ad litem denied Appellant an impartial tribunal in violation of due process

## **STATEMENT OF THE CASE**

Appellant Linh Tran Stephens, owner of both LINH TRAN STEPHENS©*TM* and of G.L.S©®, filed a hybrid emergency petition seeking a writ of habeas corpus on behalf of her firstborn female offspring, G.L.S. (a minor), under 28 U.S.C. §§ 2241 and 1651, *together with* claims for injunctive and declaratory relief under 42 U.S.C. § 1983, challenging a fraudulent administrative child-abuse "substantiation" and the deprivation of her parental rights. On January 22, 2026, the district court dismissed the petition without prejudice for alleged lack of habeas jurisdiction, relying on *Lehman v. Lycoming County Children's Services Agency*, 458 U.S. 502 (1982), and *Roman-Nose v. New Mexico Department of Human Services*, 967 F.2d 435 (10th Cir. 1992), and entered judgment (ROA 193–197). The court ruled that a § 1983 claim cannot be initiated by including it in a habeas petition (ROA 195). The court's mailed copy of the order and judgment was returned undelivered on March 9, 2026, and Appellant did not receive timely notice (ROA 205). Appellant filed a *Combined Notice of Appeal and Motion to Reopen* under Fed. R. App. P. 4(a)(6) and for relief under Fed. R. Civ. P. 60. This Court (10th Circuit) docketed the appeal as No. 26-5040 and abated it. On May 18, 2026, the district court

granted reopening under Rule 4(a)(6) and deemed the appeal timely; one day later, on May 19, 2026, it denied leave to appeal in forma pauperis on the ground that the appeal presented no "reasoned, nonfrivolous" question (ROA 319–320). Appellant now submits this combined brief and application for a certificate of appealability.

**STATEMENT OF FACTS** – **See also Exhibit A: "VERIFIED DECLARATION OF LINH TRAN STEPHENS," executed pursuant to 28 U.S.C. § 1746**

**1. The administrative "substantiation" entered without a hearing.** The Oklahoma Department of Human Services maliciously and and retaliatorily issued a formal finding (referral No. 2195835) "substantiating" allegations of abuse against Appellant and naming her as the perpetrator, applying the agency's own "some credible evidence" standard. Appellant attests she received notice only after the fact, by mail; that the only review offered was a paper "file review"; and that the agency's own form stated she was not eligible to appeal OKDHS decision while court action was pending. Appellant was denied a meaningful hearing, deprived of any opportunity to confront or cross-examine adverse witnesses (who were merely financially incentivized court actors offering second-hand, inadmissible hearsay), and stripped of a neutral decision-maker. (**Exhibit A** = Ex. A, Decl. ¶¶ 16-18; ROA 16, 27, 29, 47, 61).

**2. Removal and loss of contact.** Appellant, the biological mother of G.L.S., held 50/50 joint legal and physical custody with "unhampered access" under a January

2016 Oregon dissolution decree (Columbia County, No. 15DR18623), establishing Oregon—not Oklahoma—as the controlling jurisdictional state. On December 3, 2021, the State abruptly removed G.L.S. from school via an *ex parte* order without exigent circumstances, physical danger, or harm, despite veteran private school teachers affirming the child was happy, healthy, safe, and free from abuse. Following nine months of continuous delays and postponed hearings, OKDHS actively isolated Appellant by denying all phone calls, video chats, and normal visits. The agency subsequently restricted her to therapeutic supervised visitation at a prohibitive fee of $150 per hour, while violating her First Amendment rights by threatening to terminate all contact if she engaged in photography, audio recording, or religious speech. The State never restored custody; Appellant has been deprived of any meaningful contact since December 3, 2021—worsening to minimal contact since May 2024—all without the meaningful evidentiary hearing due process demands (Ex. A, Decl. ¶¶ 7, 12–15; ROA 24, 28, 30, 48, 51, 84, 101).

**3. Contradicted by contemporaneous evidence.** Appellant attests the substantiation was not only entered without due process but false—*contradicted* by contemporaneous photographic and video evidence from the home visit and by seven (7) reliable witness affidavits submitted to OKDHS (Ex. A, Decl. ¶ 19; ROA 30, 47, 49–54, 56).

**4. No Title IV-E eligibility determination.** Appellant has never received—and has never been informed of—any Title IV-E eligibility determination for G.L.S., and is aware of no contemporaneous judicial finding that Appellant Linh's continued care would be "contrary to the welfare" of G.L.S., or that the State made "reasonable efforts" to prevent removal (Ex. A, Decl. ¶¶ 38-39; ROA 16, 20, 75, 84, 112).

**5. Notice of the judgment.** Appellant did not receive timely notice of the district court's judgment because the court's mailing was returned undelivered, through no fault of her own; her mailing address was and remains operational for her routine mail. The district court credited this lack of timely notice in reopening the time to appeal (ROA 205).

## STANDARD FOR A CERTIFICATE OF APPEALABILITY

A certificate of appealability issues upon "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For procedural dismissals, an applicant meets this low threshold by showing that jurists of reason could debate both the underlying constitutional merits and the correctness of the procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The inquiry asks only if the dismissal was debatable—not whether the applicant will ultimately prevail—resolving all doubts in the applicant's favor. *Miller-El v. Cockrell*, 537

U.S. 322, 336 (2003). Standalone claims brought under 42 U.S.C. § 1983 require no certificate and are reviewed *de novo*.

## SUMMARY OF ARGUMENT

The State branded Appellant a child abuser via an administrative "substantiation" entered with no hearing, confrontation, or neutral decision-maker, removed her child (G.L.S.) without exigent circumstances or proof of harm, and has enforced a five-year separation without a meaningful evidentiary hearing. This "stigma-plus" injury implicates a protected liberty interest that cannot be imposed without due process. *Paul v. Davis*, 424 U.S. 693 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433 (1971). A parent's interest in child custody is a fundamental liberty interest. *Troxel v. Granville*, 530 U.S. 57 (2000); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Stanley v. Illinois*, 405 U.S. 645 (1972).

Under binding Tenth Circuit law, a parent's right to familial association cannot be disrupted without adequate pre-deprivation procedures, and officials violate the Constitution by misrepresenting facts to seize a child. *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306 (10th Cir. 1999); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003); *Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006); *Hollingsworth v. Hill*, 110 F.3d 733 (10th Cir. 1997). The factually false finding is completely refuted by contemporaneous video, photographic, and affidavit evidence. Investigators who violate due process by

fabricating investigative evidence are not entitled to qualified immunity. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010).

Although the district court dismissed the petition for lack of habeas jurisdiction under *Lehman v. Lycoming County Children's Services Agency*, 458 U.S. 502 (1982) and *Roman-Nose v. New Mexico Department of Human Services*, 967 F.2d 435 (10th Cir. 1992), jurists of reason could debate whether this challenge to the state's administrative process—rather than a request to relitigate domestic custody—falls within *Lehman*. Furthermore, because Appellant's standalone 42 U.S.C. § 1983 civil rights claims require no certificate of appealability, the court committed reversible error by failing to sever them, resulting in an improper blanket dismissal. The court's own order reopening the appeal window confirms the issues are non-frivolous. Finally, the presiding judge's admitted financial relationship with the court-appointed guardian ad litem independently demonstrates the denial of an impartial tribunal. A certificate of appealability should issue, and the dismissal should be reversed.

## ARGUMENT

### I. The State Violated Appellant's First Amendment Rights—to Petition the Courts for Redress, to Free Speech, and to the Free Exercise of Religion—Acting Under Color of Law in Both Individual and Official Capacities

The First Amendment guarantees "the right of the people … to petition the Government for a redress of grievances," U.S. Const. amend. I, and the Supreme Court has long held that "the right of access to the courts is … but one aspect of the right of petition." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); accord *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (holding that the Petition Clause protects the right of individuals to invoke the jurisdiction of courts and other adjudicatory forums, and that the 'public concern' limitation is strictly confined to public employees and has no application to a private citizen). Appellant attests that the State's actions extended beyond a mere denial of due process; the State actively obstructed and penalized her fundamental right to petition the court. First, Appellant was denied a meaningful evidentiary hearing regarding the underlying 'substantiation' and also the removal. Second, her repeated motions seeking judicial recusal and review were systematically rebuffed. Finally, the critical disability accommodation she required for meaningful participation—the assistance of an ADA advocate (American Disability Act) recommended by her primary care physician—was effectively revoked in practice during the actual hearings despite prior prehearing approval, all while opposing parties were granted the accommodation of appearing remotely (Ex. A, Decl. ¶¶ 18, 34–35). Obstructing a litigant's access to the very forum established to redress

her grievance is itself a First Amendment injury, independent of the Due Process Clause.

The First Amendment independently forbids government officials from retaliating against a person for protected speech and petitioning: "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)); see *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (a novel or unusually selective invocation of legal process against a critic may proceed notwithstanding probable cause). A claimant must show that she engaged in protected activity and that it was a substantial or motivating factor in the adverse action. *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977). Appellant attests that she engaged in core protected activity under the First Amendment, which included reporting her offspring's disclosures of paternal abuse, filing protective orders, pursuing administrative appeals, and lodging complaints against state officials who inverted the narrative to pathologize the protective parent while treating the abuser as a safe placement. The State systematically weaponized its authority to answer that protected advocacy with severe adverse actions, including a fabricated 'substantiation,' the summary removal of her child, and the execution of retaliatory arrest warrants. These warrants were driven by the abusive parent's clearly

fraudulent protective order ("PO") and Violations of Protective Order ("VPO") filings, which were entirely devoid of evidentiary support and uncorroborated by any independent witnesses, relying solely on the self-serving assertions of the abuser and aligned state actors (Ex. A, Decl. ¶¶ 22, 25). Whether that retaliation is actionable is, at the least, debatable among jurists of reason.

Appellant also invokes the Free Exercise Clause and the related liberty interest in directing her offspring's religious upbringing. A parent's right to guide the religious education and upbringing of her child is protected by the First and Fourteenth Amendments. *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925). The interference in this matter is uniquely concrete. Appellant attests that following the child's removal, the State restricted her to supervised visitation at a prohibitive cost of approximately $150 per hour, deliberately denying the free or low-cost alternatives that Appellant requested due to her limited income. Furthermore, the State imposed unconstitutional prior restraints on her speech, religious expression, photography, and audio recording during visits. In an overt act of viewpoint discrimination, OKDHS visitation supervisor Cheryl Hall threatened to terminate all parental contact if Appellant continued to teach G.L.S. the scriptural lesson of the 'Armor of God' (Ephesians 6). The supervisor went so far as to forbid Appellant from sitting adjacent to her child, effectively banning basic physical embraces and private

communication (Ex. A, Decl. ¶¶ 14–15; see ROA 30, 48, 51). When a state actor conditions a parent's visitation on the specific content of her religious instruction, she is not enforcing a neutral, generally applicable regulation. Instead, she impermissibly targets a religious practice for discriminatory treatment—an action that is presumptively unconstitutional and survives only under strict judicial scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 546 (1993). Furthermore, these restrictive conditions inflict a severe, unjustified burden on both Appellant's and her child's freedom of speech and their reciprocal right to intimate familial association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–19 (1984).

Finally, these violations are cognizable under 42 U.S.C. § 1983: the responsible state actors acted under color of law and are answerable in their individual capacities, *Hafer v. Melo,* 502 U.S. 21, 27–31 (1991), and in their official capacities to the extent a policy or custom caused the violation; and any private party who jointly participated with those state actors—for example, by invoking the coercive machinery of the courts in concert with them—likewise acted under color of law and is subject to suit. *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982). These First Amendment questions are substantial and, at the very least, debatable among jurists of reason; a certificate of appealability should issue.

## II. Administrative Abuse "Substantiation," Imposed Without Any Hearing, Deprived Appellant of a Protected Liberty Interest Without Due Process

A government adjudication branding an individual a child abuser goes far beyond a mere injury to reputation. When coupled with tangible, severe consequences—such as the loss of parental time and the forced disruption of the mother-child relationship—it creates a 'stigma-plus' deprivation actionable under the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693, 711 (1976). 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). The Tenth Circuit operationalizes this core principle via a two-part stigma-plus test, establishing that a liberty interest is infringed when: (1) the state makes a defamatory statement capable of being proven false that (2) simultaneously alters the individual's legal status. *Gwinn v. Awmiller*, 354 F.3d 1211, 1224 (10th Cir. 2004). An official agency finding placing a parent on a state abuse registry while dynamically divesting her of custody represents the quintessential paradigm of a stigma-plus claim. *See Valmonte v. Bane*, 18 F.3d 992, 1001–02 (2d Cir. 1994); *Dupuy v. Samuels*, 397 F.3d 493, 509–11 (7th Cir. 2005).

Appellant attests that the Oklahoma Department of Human Services issued an administrative 'substantiation' naming her as an abuser based upon a mere 'some

credible evidence' standard. This severe deprivation occurred without prior notice, and the sole review provided was a closed administrative 'file review' of internal OKDHS documents that systematically excluded Appellant's filings, evidence, and witness disclosures. The agency's own documentation explicitly barred her from seeking an administrative appeal on the ground that concurrent court action was pending. As a result, Appellant was stripped of a meaningful hearing, denied the rights of confrontation and cross-examination, deprived of a neutral decision-maker, and refused access to the investigative files necessary to promptly mount a defense (Ex. A, Decl. ¶¶ 16–18; ROA 16, 27, 29, 48, 61). Because these allegations establish a colorable, substantial deprivation of constitutional due process, reasonable jurists could, at a minimum, debate the propriety of the district court's dismissal. A Certificate of Appealability should therefore be granted.

## III. Severing the Parent-Child Relationship for Years Without a Meaningful Hearing Violated Due Process

A parent's interest in the care, custody, and control of her child is 'perhaps the oldest of the fundamental liberty interests' recognized under the Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Accordingly, the law presumes that a parent acts in the child's best interests; the State cannot displace this presumption absent an official finding of unfitness or abuse made via a

constitutionally sound administrative framework. *Parham v. J.R.*, 442 U.S. 584, 602 (1979). To satisfy the Fourteenth Amendment, such a framework must afford the individual a robust 'opportunity to be heard at a meaningful time and in a meaningful manner.' *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Binding Tenth Circuit precedent applies these foundational principles directly to child-welfare removals. Except under extraordinary circumstances, 'a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures.' *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999); *accord Roska v. Peterson*, 328 F.3d 1230, 1245 (10th Cir. 2003). State actors may seize a child without prior judicial authorization only upon 'reasonable suspicion of an immediate threat to the safety of the child.' *Gomes v. Wood*, 451 F.3d 1122, 1130 (10th Cir. 2006). Because no such immediate threat existed in Appellant's case, the warrantless seizure was wholly unjustified, as the mere possibility of danger cannot satisfy the standard requiring an exigent threat and a prompt post-deprivation hearing. *See Hollingsworth v. Hill*, 110 F.3d 733, 739–40 (10th Cir. 1997).

The State's interference with Appellant's fundamental parental rights is profound and well-documented: Appellant was the long-time primary caregiver biological mother for G.L.S and is also a primary care physician (D.O.) by training and an honorably discharged Navy medical officer after five (5) years of active

duty service as a Lieutenant (O-3) – and provided for G.L.S.'s food, shelter, schooling, medical care, and daily needs (Ex. A, Decl. ¶¶ 1-2). Her parental interest here was neither abstract nor newly claimed: a January 2016 Oregon decree of dissolution (Columbia County, Oregon, No. 15DR18623) granted Appellant joint legal and physical custody of G.L.S. with unhampered access, so when Oklahoma removed the child by ex parte order and later placed sole custody with the father, it stripped an established, court-ordered custody right—a deprivation that demanded correspondingly robust process and received none (Ex. A, Decl. ¶ 5). By ignoring this sister-state decree and utilizing *ex parte* proceedings to transfer custody to the father, the State divested Appellant of vested, court-ordered custody without due process. Oklahoma's action also contravened the *Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)*. Because Oregon (<u>not</u> Oklahoma) entered the initial custody determination and retained exclusive, continuing jurisdiction, an Oklahoma court "may not modify" that determination unless Oregon relinquished jurisdiction or no party still resided in Oregon—neither of which occurred. *Okla. Stat. tit. 43*, § 551-203; see *O.R.S. § 109.701 et seq*. Appellant invokes the UCCJEA not as a freestanding cause of action, but as further proof that the Oklahoma State stripped a vested, court-ordered custody right in disregard of the governing jurisdictional framework, compounding the due-process violation.

Since December 03, 2021, the State has effectively severed the mother-daughter relationship without providing a meaningful evidentiary hearing, without establishing a record of waiver, and without producing any proof that Appellant knowingly or voluntarily relinquished her fundamental constitutional rights (Ex. A, Decl. ¶¶ 7, 9-10; ROA 24, 28, 30, 84, 101). Further, the State imposed unconstitutional prior restraints on Appellant's speech and religious expression, conditioning parental contact on the relinquishment of her First Amendment rights. The State forced Appellant into a restrictive, cost-prohibitive visitation framework—**totaling a mere thirty hours of supervised contact over five years**—while shielding this regimen from judicial review through coercive threats of termination. Such severe restrictions on a fit parent, imposed without narrow tailoring or procedural adequacy, represent a clear departure from constitutional norms. (Ex. A, Decl. ¶¶ 14-15; ROA 51, 91, 104).

A purported post-removal hearing conducted nine months after the fact cannot cure the underlying constitutional infirmity. Under *Gomes v. Wood*, an emergency removal without prior judicial authorization is permissible only upon 'reasonable suspicion of an immediate threat to the safety of the child,' and it must be accompanied by a prompt post-deprivation hearing. 451 F.3d 1122, 1130 (10th Cir. 2006). This requirement does not excuse a total denial of process; it presupposes it. The procedural deprivation here is far more absolute than that in

*Gomes*. Appellant attests she was denied a meaningful hearing at any stage—pre-deprivation or post-deprivation—and that the agency's own forms explicitly barred an administrative appeal of the abuse 'substantiation' due to pending court action. G.L.S. was removed on Friday, December 3, 2021, after 6 P.M., initiating a continuous period of separation during which Appellant has been denied both a prompt post-removal hearing on the seizure and any hearing on the merits of the substantiation.

The State's federal funding records under Title IV-E verify this constitutional deficit. Federal law strictly conditions Title IV-E foster-care funding on contemporaneous, case-specific judicial findings that mirror core constitutional protections. Specifically, the state court must issue an explicit, case-by-case determination in its initial order that continuation in the home is 'contrary to the welfare' of the child, 42 U.S.C. § 672(a)(2); 45 C.F.R. § 1356.21(c), and that the agency made 'reasonable efforts' to prevent placement, 42 U.S.C. § 671(a)(15); 45 C.F.R. § 1356.21(b). Under 45 C.F.R. § 1356.21(d), these findings must be 'explicitly documented' in the order itself; they cannot be satisfied by unverified affidavits from non-credible witnesses like Bridget O'Brien (a.k.a. Bridget Menser, a convicted felon), by *nunc pro tunc* orders, or by boilerplate references to state statutory text (Ex. A, Decl. ¶ 26).

G.L.S. was removed from Appellant's safe maternal custody on December 3, 2021. The State's compliance with these mandates should be memorialized in its contemporaneous Title IV-E eligibility determination. Appellant has never been permitted to review (Ex. A, Decl. ¶¶ 38–39), nor has she been notified of any such determination. The apparent absence of these required findings strongly corroborates that the removal lacked the foundational pre-deprivation determinations required under Tenth Circuit precedent. At a minimum, this represents a triable issue of fact requiring record development, and the underlying constitutional question is eminently debatable among jurists of reason. This procedural failure is underscored by Appellant's uncontradicted attestation that the State failed to evaluate her three-generation, seven-page inventory of safe, fit, and willing maternal relatives, neighborhood networks, and church community placements. This total failure to investigate viable family placements refutes any claim of 'reasonable efforts' under the statutory framework (Ex. A, Decl. ¶¶ 36–37; ROA 47, 112). Appellant invokes the Title IV-E framework not to assert a private right of action under the funding statute, but as evidentiary proof that the State bypassed mandatory constitutional prerequisites.

## IV. Fabrication or Misrepresentation of Evidence by a Caseworker Violates Due Process

Tenth Circuit precedent firmly establishes that state officials violate the Fourth and Fourteenth Amendments by misrepresenting material facts to secure judicial authorization for a child's seizure. *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1316 (10th Cir. 1999). This aligns with this Circuit's broader recognition of a core constitutional right to be free from liberty deprivations engineered through fabricated investigative evidence. *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004); *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111–12 (9th Cir. 2010) (persuasively holding that an investigator's deliberate fabrication of evidence in an abuse inquiry violates due process).

Appellant's attestations outline an egregious violation of these principles. The administrative 'substantiation' was both procedurally deficient and factually false, stands directly refuted by contemporaneous photographic and video evidence, and is contradicted by seven reliable firsthand affidavits timely submitted to OKDHS (Ex. A, Decl. ¶ 19). Although Appellant's prior protective reports and an independent mandatory reporter's flag explicitly identified G.L.S. as endangered in paternal custody, the State bypassed these warnings, removed the child from Appellant, and transferred custody to the abusive father. These anomalies support a compelling inference of retaliatory fabrication (Ex. A, Decl. ¶¶ 22–23; ROA 16, 47, 53–56).

Most critically, Appellant attests that an agency supervisor actively doctored a caseworker's investigative report—deliberately expunging allegations against the father while fabricating allegations against Appellant. This systemic manipulation of evidence was subsequently verified under oath by OKDHS whistleblower Maria Chico during court proceedings (Ex. A, Decl. ¶ 24; ROA 29, 32, 75, 101, 106). Because an intentional falsification of investigative records by state actors represents a profound constitutional injury, the district court's dismissal is, at a minimum, debatable among reasonable jurists. Accordingly, the standard under *Slack v. McDaniel* is met, and a Certificate of Appealability should issue.

**V. Jurisdictional Dismissal Is Debatable, and the § 1983 Claims Should Not Have Been Barred**

The district court dismissed the hybrid petition in its entirety for lack of habeas jurisdiction, tracking *Lehman v. Lycoming Cnty. Children's Servs. Agency*, 458 U.S. 502 (1982), and *Roman-Nose v. N.M. Dep't of Human Servs.*, 967 F.2d 435 (10th Cir. 1992). Because the petition was rejected on procedural grounds, a Certificate of Appealability must issue if reasonable jurists could debate the correctness of that threshold ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The district court's procedural ruling is eminently debatable for two independent reasons.

First, as the Supreme Court has observed, the writ of habeas corpus historically encompassed child-custody challenges. *Lehman*, 458 U.S. at 510–11. Jurists of reason could certainly debate whether Appellant's claim falls completely outside the restrictive boundaries of *Lehman* and *Roman-Nose*. Appellant's action is a direct constitutional challenge to the state's administrative mechanism—specifically, an extrajudicial abuse 'substantiation' issued completely devoid of a hearing, confrontation rights, or a neutral arbiter—not an attempt to relitigate a domestic custody decree. *Roman-Nose* is procedurally inapposite; it barred federal habeas review where a petitioner sought to invalidate a state court's final custody judgment. Appellant seeks no such intervention. Her primary constitutional injury is the administrative registry listing itself—an independent agency action that is causally separated from any judicial custody order. The district court committed a clear error of law by mischaracterizing this distinct procedural due process claim as a standard 'child custody dispute.' (ROA 193–197).

Second, and independently, Appellant's petition was a hybrid filing that also sought relief under 42 U.S.C. § 1983 against individual officials—specifically DHS Director Cartmell and caseworker O'Brien—in their individual capacities for their own unconstitutional conduct. Appellant alleges that Director Cartmell was directly provided with affidavits and formal notices of ongoing constitutional

violations, among them explicit evidence that OKDHS employees had deliberately truncated investigative reports (Ex. A, Decl. ¶ 24; ROA 32). Neither *Lehman* nor *Roman-Nose* bars such a § 1983 action; the district court dismissed these claims solely on the ground that a § 1983 action cannot be initiated within a habeas petition. (ROA 195–196). Because a *pro se* (sui juris in this case) pleading must be liberally construed, *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and because a § 1983 claim requires no Certificate of Appealability, a civil rights plaintiff is entitled to proceed as a matter of right under 28 U.S.C. § 1291. Consequently, the district court's blanket dismissal of the entire petition on threshold habeas-jurisdiction grounds—without conducting a separate inquiry into the standalone civil rights claims—constitutes an error that is, at a minimum, highly debatable. The legally sound path required the court to permit the § 1983 claims to advance independently or to dismiss the habeas component without prejudice to their continued pursuit.

Furthermore, neither the *Rooker-Feldman* doctrine nor the domestic-relations exception poses a jurisdictional bar to these claims. *Rooker-Feldman* is inapplicable because Appellant targets the unconstitutional nature of the state's investigative and administrative processes rather than seeking federal appellate review of a state court decree. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Similarly, original federal-question

jurisdiction under 28 U.S.C. § 1331 remains intact because the domestic-relations exception is strictly narrow, carving out only the actual issuance of divorce, alimony, or child-custody decrees. *Ankenbrandt v. Richards*, 504 U.S. 689, 701–04 (1992). Appellant does not petition the federal court to execute or modify a custody decree; rather, she demands civil redress under § 1983 for systemic violations of her federal rights. This distinction is anchored in binding circuit precedent: *Malik*, *Roska*, *Gomes*, and *Pierce* underscore that § 1983 child-removal actions are fully cognizable on the merits in a federal forum. The district court's recharacterization of this constitutional challenge as a non-cognizable 'child custody dispute' directly conflicts with this established jurisprudence.

Nor does *Younger v. Harris*, 401 U.S. 37 (1971), counsel abstention. *Younger* restrains federal courts from enjoining ongoing state judicial proceedings; it does not bar review of a completed administrative act. Appellant's § 1983 claims target a discrete, finished agency action—the extrajudicial abuse "substantiation" and the conduct of the named officials—not any pending state proceeding this Court is asked to enjoin. Abstention is also unwarranted where the state process was conducted in bad faith or with demonstrated bias, both of which Appellant has alleged with record support, including the presiding judge's admitted financial relationship with the guardian ad litem and the agency's documented alteration of

investigative evidence. *Younger*, 401 U.S. at 53–54. At a minimum, whether abstention applies is debatable among jurists of reason.

Critically, Appellant does not ask the federal judiciary to manage a domestic relations matter or resolve competing state-court orders. She seeks to hold Oklahoma officials accountable for violating her federal rights by extrajudicially dismantling a valid, pre-existing Oregon custody decree over her timely, preserved jurisdictional objections. The fact that the defendant state actors summarily overruled those objections does not extinguish the federal question; instead, it illustrates the exact abuse of authority § 1983 was enacted to remedy. Finally, because the constitutional deprivation is active and continuous, and because Appellant has never consented to the separation and unremittingly pursues family reunification, the controversy remains live and entirely defeats any assertion of mootness. (Ex. A, Decl. ¶ 40).

Finally, the district court's own contradictory conduct confirms that this appeal is far from frivolous. On May 18, 2026, the court granted Appellant's motion to reopen the time to appeal pursuant to Federal Rule of Appellate Procedure 4(a)(6). By definition, this relief required the court to find that no adverse party would suffer prejudice—a threshold meaning prejudice distinct from the ordinary burdens of appellate litigation or the inherent risk of reversal. Unfathomably, only one day later, the court issued an order denying leave to

proceed *in forma pauperis* on the ground that the appeal was not taken in good faith because it was neither 'reasoned' nor 'nonfrivolous.' (ROA 319–320).

The district court's actions are irreconcilable. Its initial determination that the operative claims warranted a reopened appellate window is structurally incompatible with its subsequent conclusion that the exact same appeal is frivolous. An appeal that a district court reopens, acknowledging it carries a live risk of appellate reversal, inherently possesses an arguable basis in law or fact. *See DeBardeleben v. Quinlan*, 937 F.2d 502, 505 (10th Cir. 1991) (establishing that an appeal is nonfrivolous where a petitioner presents a reasoned, arguable point on the law and facts). Accordingly, a Certificate of Appealability should issue.

## VI. The Presiding Judge's Admitted Financial Relationship With the Court-Appointed Guardian ad Litem Denied Appellant an Impartial Tribunal

An impartial decision-maker is a basic requirement of due process. Indeed, "[a] fair trial in a fair tribunal is a basic requirement of due process," and our system of law "has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955). Recusal is constitutionally required whenever "the probability of actual bias on the part of the judge … is too high to be constitutionally tolerable" — an objective standard that does not depend on proof of actual bias. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872, 877 (2009) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)); see *Tumey v. Ohio*,

273 U.S. 510, 532 (1927) (a judge's pecuniary relationship to a matter offends due process); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) (disqualification required where the judge had a financial interest in the outcome). Appellant attests, and the state-court transcript reflects, that the presiding judge stated on the record that the court-appointed guardian ad litem — whose recommendations the court adopted against Appellant — "or his firm has … given [the judge] money," and that the guardian was a compensated witness billing $225–$250 per hour. (Ex. A, Decl. ¶ 34; Tr. of July 24, 2023, at 97–98, 38, 40–44.) A judge's admitted financial relationship with the very official whose recommendations drove the deprivation creates a risk of bias that is too high to be constitutionally tolerable, and Appellant's motions to recuse were denied. *Caperton*'s facts involved campaign contributions, but its governing standard — together with the older pecuniary-relationship rule of *Tumey* — reaches this admitted relationship as well. To the extent this impartial-tribunal claim was raised and is preserved as part of Appellant's due-process allegations below, whether its rejection was correct is, at the least, debatable among jurists of reason, and a certificate of appealability should issue.

## VII. Reservation of Issues and Magistrate Objection

Appellant preserves her continued objection that dispositive matters were referred to a magistrate judge, and maintains that she is entitled to determination by

an Article III judge, with *de novo review* of any report and recommendation on a dispositive matter. 28 U.S.C. § 636(b)–(c); Fed. R. Civ. P. 72; *United States v. Raddatz*, 447 U.S. 667 (1980). Appellant on behalf of her entity LINH TRAN STEPHENS©™ and her entity G.L.S.©® expressly reserves all federal constitutional and statutory claims fairly encompassed by the petition and record, and requests leave to develop them in any merits briefing the Court orders.

## RELIEF SOUGHT

For these reasons, Appellant respectfully requests that this Court: (1) grant a certificate of appealability on the issues presented, to the extent one is required; (2) hold that no certificate is required for Appellant's claims under 42 U.S.C. § 1983 and review their dismissal *de novo*; (3) reverse the dismissal and remand for consideration of the merits on all matters, or for leave to proceed on the § 1983 claims; (4) grant leave to proceed in forma pauperis on appeal; and (5) grant such further relief as justice and equity require.

**WHEREFORE**, I, the Appellant woman named Linh, respectfully move this Court and lawfully demand—with all her rights reserved, as has always been the case, and forevermore—that to preserve these issues for further review, the Court issue a reasoned written disposition stating the explicit factual and legal basis (**Statement of Unrebutted Findings of Fact and Conclusions of Law**) for its ruling; rather than a summary order, a written disposition is required so that the

application of governing law to this record is made plain, while taking judicial notice of www.linhstephens.com public record and of these verified facts:

**1. I am not a surety and I have not, do not, and will not ever consent to any court's attempted body attachment warrant as I, Linh Tran Stephens (lower case) is a "free [nonblack] person" and stateless American national** ("woman" of the "Union"), in accordance with the statements made by the Honorable Justice Miller in the *Slaughter-House Cases*, 83 US 36 (U.S. Supreme Court - 1873), and the Honorable Chief Justice Wallace in *ELLEN R. VAN VALKENBURG v. ALBERT BROWN*, 43 Cal. 43 (California Supreme Court - 1872). Linh Tran Stephens is not and has never been a U.S. citizen, as clearly delineated in 28 USC 1332(a)(1). The rights of Linh Tran Stephens, the sentient being, are derived from the Bill of Rights, rather than the Fourteenth Amendment; however, her sole proprietary entity, LINH TRAN STEPHENS, holds Fourteenth Amendment rights along with all other constitutional protections. Linh Tran Stephens is neither a negro nor a descendant of such. Linh Tran Stephens would be considered a "people" in plural usage. Linh Tran Stephens' biological property is G.S. as her flesh and blood. **Meanwhile, Linh is the owner of LINH TRAN STEPHENS©™ and G.L.S.©® also is secured party creditor of LINH TRAN STEPHENS©™, which is a 14th Amendment** US citizen in accordance with 8 USC 1401(a), deriving her standing from the privileges and immunities available in the 14th Amendment, and would

be termed a "person" in plural usage; she was born on February 09th, 1984. She falls under the subheading of "individual" in the definition of the word "person" as described in 8 USC 1101(b)(3). The legal structure of LINH TRAN STEPHENS©® is a sole proprietorship. Her EIN number is the "Social Security Number" in accordance with 26 CFR 301.7701-11.

**2**. All statements herein are verified/attested and reliable statements of facts witnessed by Linh the Appellant, heavens and Earth, YAHUAH/I AM THAT I AM/Creator, Messiah Yahusha, and the Holy Spirit of truth, light, and justice–AS IT IS WRITTEN AND AS SURELY AS THE LORD LIVES: "For I, the LORD, love justice; I hate robbery and wrongdoing. [Isaiah 61:8a]!", "One witness shall not rise up against a man for any iniquity, or for any sin, in any sin that he sinneth: at the mouth of two witnesses, or at the mouth of three witnesses, shall the matter be established [Deuteronomy 19:15]" and as pursuant to YAHUAH's law including but not limited to **Psalm 127:3[1] + Exodus 8:1&9:1[2] + Isaiah 61:8a[3] + Deut 19:15[4].**

---

[1] "Lo, children are a heritage of the Lord: and the fruit of the womb is His reward." (Psalm 127:3 GNV). This verse affirms that children are a divine gift from God—not property of the state, nor wards of the court, but sacred trusts entrusted by the Creator YHWH יהוה

[2] YAHUAH ordered you rulers: "Let my people go, that they may serve me" (Exodus 8:1). "Let my people go, so that they may worship me" (Exodus 9:1).

[3] For I, the LORD, love justice; I hate robbery and wrongdoing. (Isaiah 61:8a)

[4] One witness shall not rise up against a man for any iniquity, or for any sin, in any sin that he sinneth: at the mouth of two witnesses, or at the mouth of three witnesses, shall the matter be established [Deuteronomy 19:15)

Notice to Agent is Notice to Principal, Notice to Principal is Notice to Agent, Notice applies to all successors and assigns; Affidavit is a Form of Evidence; Unrebutted Affidavit Stands as Truth in Commerce; **Silence is Tacit Acquiescence/Agreement/Dishonor/Accomplice to described crimes, claims, and harms;**

**Please take Notice that** this is sent to you in the peace and love of Messiah Yashua [Jesus Christ]. **Luke 11:52[5]**. *Nemo me impune lacessit* pursuant to **Psalm 105:15[6]** + **Isaiah 54:17[7]**.

## AVOUCHMENT / VERIFICATION

i hereby declare, verify, certify and affirm, pursuant to the penalties of perjury under the laws of the united states of America, and by the provision of **28 U.S. Code § 1746** that i am of sound mind and competent in full capacity to make this verification, and that all of the above and foregoing representations are true and correct to the best of my knowledge, information, belief.

Executed in Newberry County, republic land of South Carolina on this 26th day of June in the Year of Our Lord Two Thousand and Twenty Six.

Private sector autograph; **WITHOUT RECOURSE**

*without prejudice linh–tran: stephens/Agent*

By one–and–only beneficiary:
Linh Tran Stephens / one-and-only Authorized Agent or attorney-in-fact and **Secured Party Creditor & TTEE of LEGAL ENTITIES LINH TRAN STEPHENS©™ and of G.L.S©® ens legis and all its derivatives thereof** including Cestui Que Trust a.k.a. "Fide Commissary Trust", **Non-Assumpsit,** All Rights Reserved None Waived Ever, **Without Prejudice *UCC 1-308 & 1-103*,** sui juris, attorney-in-fact, Applicant/Appellant/Claimant, Ambassador of יהוה and Heir of the Creator a/k/a the I AM THAT I AM, my heir/offspring/inheritance-from-YWHW is G.L.S and all her siblings; By the Holy and Eternal Authority vested in me by Yahusha Ha'Mashiach and as High Royal Priest (1 Peter 2:9) of Melchizedek Order (Hebrews 7:17), I do hereby seal, confirm, and sanctify this instrument and its contents as lawfully issued in all Heavens and upon the Earth,

---

[5] "Woe to you experts in the law, because you have taken away the key of knowledge. You yourselves have not entered, and you have hindered those who were entering." (Luke 11:52)
[6] "Touch not mine anointed, and do my prophets no harm." (Psalm 105:15 GNV).
[7] "No weapon that is formed against thee shall prosper, and every tongue that shall rise against thee in judgment, thou shalt condemn. This is the heritage of the servants of the Lord, and their righteousness is of me," saith the Lord YHWH (Isaiah 54:17 GNV)

A natural living free[8] woman upon land breathing with a living soul & Holy Spirit, natural people with hands legs, Alive-on-the-land, Plenary mind body soul/spirit, unlimited, non-incorporated, non-sole-proprietor, **stateless** "**freeman of the Union**" per Honorable Mr. Justice MILLER on April 14th, 1873, in the Slaughter-House cases, 83 US 36 (a SCOTUS case specifically mentioned in 8 FAM 102.3), full capacity and competency with postgraduate level of education, living on the land of the republic, with God-given rights pursuant to Bills of Rights, NOT a "pro se"/"person"/"pauper"/"indigent"/"slave"/"public servant"/"government employee"/"ward of State"/"U.S. citizen"/"minor" in your black law dictionary; i reject your 12 legal presumptions/assumptions/double-speaking and reject all implied/undisclosed/uninformed contracts; as Article IV Section 2 Citizens of each State is entitled to all Privileges & Immunities; **in care of:** 235 Tom Stewart Rd, Newberry, South Carolina 00000 ZIP EXEMPT [near 29108] without the United States District of Columbia Telephone: (843) 608-0294 Email: linhstephens7@gmail.com

**Notice:** Using a Notary on this document does ***not*** create any adhesion contract with the state/USA INC, nor does it alter any legal status of any of the parties hereto in any manner, but is used only for verification, identification, and certification purposes and not for entrance into any foreign jurisdiction nor into U.S. jurisdiction. All rights are reserved. Without prejudice and without recourse.

<u>**Notary as JURAT CERTIFICATE**</u>

state of Minnesota          )
                                         ) *ss*
county of Sherburne      )

On this 26th day of June, 2026 before me, Melissa K. Vagle, a Notary Public, personally appeared a living woman Linh Tran Stephens ( the one-and-only Authorized Representative for Legal Fiction LINH TRAN STEPHENS ©™ ), known to me or proved to me on the basis of satisfactory evidence to be the woman whose name is subscribed on this instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her autograph(s) on the instrument the woman executed, the instrument.

---

[8] If that Son therefore shall make you <u>free</u>, ye shall be <u>free</u> indeed (John 8:36).
"Behold, all <u>souls</u> are mine [YAHUAH]; as the <u>soul</u> of the parent [mother/father], so also the <u>soul</u> of the child [daughter/son] is mine: the soul that sinneth, it shall die." (Ezekiel 18:4).

I certify under PENALTY OF PERJURY under the lawful laws of Minnesota State and that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Melissa K. Vagle*

MELISSA K VAGLE
Notary Public
State of Minnesota
My Commission Expires
January 31, 2028

## **CERTIFICATE OF COMPLIANCE**

I certify that this combined brief and application complies with the type-volume limitation because it is 30 pages or fewer, or alternatively contains fewer than 13,000 words (6599 word count), and complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because it is prepared in a proportionally spaced 14-point serif typeface (Times New Roman).

*without prejudice*
*linh-tran: stephens/Agron*
WITHOUT RECOURSE ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

## CERTIFICATE OF SERVICE

I, Linh Tran Stephens, certify that on the date of filing I caused a true and correct copy of the foregoing to be served through the Court's CM/ECF electronic filing system, which will send notice of electronic filing to all counsel of record, and, as to any party not served electronically, by first-class United States Mail, postage prepaid, addressed as follows:

**Oklahoma Department of Human Services, CPS, and Child Support Services; Director Jeffrey Cartmell; Bridget O'Brien (via counsel of record):** John K.F. Langford, Oklahoma Department of Human Services, P.O. Box 25352, Oklahoma City, OK 73125.

**State of Oklahoma and state officers (Drummond, Stitt, OAG, Secretary of State, Governor's Office) and all otherwise-unrepresented State defendants:** Office of the Attorney General of Oklahoma, Gentner Drummond, 313 N.E. 21st Street, Oklahoma City, OK 73105.

**Tulsa County District Court and Docket C Special Judges (Seibert, Sparkman, Chesbro):** c/o Court Clerk, 500 S. Denver Avenue, Tulsa, OK 74103.

**Adam Sylvester Stephens (via counsel of record):** Gilbert J. Pilkington, Jr., Pilkington Law Firm, PLLC, P.O. Box 52614, Tulsa, OK 74152-0614.

WITHOUT RECOURSE *without prejudice linh-tran: stephens/Agent*

### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LINH TRAN STEPHENS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 25-CV-0286-CVE-MTS |
| | ) | |
| STATE OF OKLAHOMA, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER

Petitioner Linh Tran Stephens, a self-represented litigant, commenced this federal habeas action by filing a petition for writ of habeas corpus under 28 U.S.C. § 2241 (Dkt. # 2). A district court must "promptly examine" a habeas petition and dismiss it "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing Section 2254 Cases in the United States District Courts. On preliminary review of the petition, the Court finds that the petition shall be dismissed for lack of subject matter jurisdiction.[1]

## I.

Ms. Stephens describes her petition as a "hybrid emergency petition for writ of habeas corpus for [her minor child] pursuant to 28 U.S.C. § 2241, 28 U.S.C. § 1651, 12 O.S. § 1331, and

---

[1] The Clerk of Court issued summonses to Ms. Stephens on her request. Dkt. # 5. One respondent moved to dismiss the petition pursuant to Federal Rules of Civil Procedure 8, 12(b)(1) and 12(b)(6), asserting that Ms. Stephens did not comply with Rule 8(a)'s pleading requirements, that this Court lacks jurisdiction based on Eleventh Amendment sovereign immunity, and that Ms. Stephens fails to state a claim on which relief may be granted. Dkt. # 7. Because the Court finds that Ms. Stephens has not properly invoked federal habeas jurisdiction and concludes for that reason that the petition, and this habeas action, must be dismissed, the Court dismisses as moot Ms. Stephens's motion to obtain electronic case filing rights for non-attorneys (Dkt. # 4) and the motion to dismiss filed by respondent Oklahoma Department of Human Services (Dkt. # 7).

for injunctive and declaratory relief under 42 U.S.C. § 1983 with request for permanent restraining order." Dkt. # 2, at 11.[2] She states that she brings this action to challenge 'all orders entered by Tulsa County District Court and all of its divisions since Dec[ember] 3, 2021" in Tulsa County District Court Case Nos. FD-2015-2228 and JD-2021-270. Id. at 3. Ms. Stephens names as respondents in this habeas action the State of Oklahoma, several state agencies, several state officials and employees, and her ex-husband. Id. at 1. Ms. Stephens appears to allege that state and private actors violated her constitutional rights through actions or omissions made in state court proceedings relating to divorce or child custody matters. Id. at 2-8, 14-17, 21-32, 40-108. She also asserts that her minor child is "unlawfully restrained under void state court orders procured through fraud and enforced without jurisdiction." Id. at 18, 73; see also id. at 33 (describing minor child as "unlawfully detained"); id. at 35 (referring to "the unlawful seizure and continued detention of her child"); id. at 36 (asserting that she "seeks emergency relief from this Court to remedy the unlawful seizure and continuing detention of her daughter . . . by state actors operating without lawful jurisdiction and in flagrant violation of clearly established constitutional rights"); id. at 40 (asserting that minor child was "forcibly kidnapped" by Oklahoma Child Protective Services).

Ms. Stephens identifies four grounds for habeas relief: (1) "unlawful seizure of child without warrant or exigent circumstances (4th Amendment)"; (2) "violation of due process rights in child removal proceedings"; (3) "placement with documented child abuser"; (4) "disregard of valid Oregon custody decree." Id. at 7-8; see also 73-77 (describing first cause of action as seeking habeas relief for unlawful detention of minor child). Ms. Stephens also seeks relief under § 1983,

---

[2] The Court's citations refer to the CM/ECF header pagination. When quoting material from the petition, the Court omits unconventional capitalization.

asserting more than ten claims for alleged violations of her federal rights arising from state court proceedings related to divorce or child custody matters.  Id. at 77-108.  Ms. Stephens asks this Court to provide various forms of relief including an order directing "the immediate release of [her minor child] from [her ex-husband's] custody and restor[ing] custody to [Stephens], her biological owner/mother" and "declar[ing] [that] all custody, support, and enforcement orders, contempt orders, conviction or sentencing orders [are constitutionally void] as they were all procured without jurisdiction, due process, or lawful adjudication."  Id. at 8, 14.

Ms. Stephens asserts that this Court has jurisdiction to adjudicate the habeas petition under 28 U.S.C. § 2241 (federal habeas jurisdiction), 28 U.S.C. § 1651 (the All Writs Act), and 12 O.S. § 1331 (a state law) because her minor child "is detained after seizure without a warrant against the will of" the minor child "and the biological owner/Trustee (biological flesh and blood and alive mother) under void state court orders violating the Fourteenth Amendment."  Id. at 14.  She further asserts that this Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights and elective franchise jurisdiction) to adjudicate the § 1983 claims she includes in the petition.  Id. at 14-15.  Lastly, Ms. Stephens asserts that this Court has jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction).  Id. at 15.

## II.

Because Ms. Stephens appears without counsel, the Court must liberally construe the petition.  Garza v. Davis, 596 F.3d 1198, 1201 n.2 (10th Cir. 2010).  This rule of liberal construction "means that if the court can reasonably read the [petition] to state a valid claim on which [Ms. Stephens] could prevail, it should do so despite [Ms. Stephens's] failure to cite proper legal authority, [her] confusion of various legal theories, [her] poor syntax and sentence construction, or [her] unfamiliarity with pleading requirements."  Hall v. Bellmon, 935 F.2d 1106,

1110 (10th Cir. 1991).  But even a self-represented litigant must allege sufficient facts to establish the existence of federal jurisdiction.  See Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc., 693 F.3d 1195, 1201 (10th Cir. 2012) (noting that the party invoking federal jurisdiction bears the burden to identify the basis of court's jurisdiction).

Even generously construing the petition, the Court finds that this action shall be dismissed for lack of subject matter jurisdiction.  To the extent Ms. Stephens seeks federal habeas relief under § 2241, she has identified no facts that would permit this Court to exercise federal habeas jurisdiction.  See 1mage Software, Inc. v. Reynolds and Reynolds Co., 459 F.3d 1044, 1048 (10th Cir. 2006) ("Federal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party,' and thus a court may sua sponte raise the question of whether there is subject matter jurisdiction 'at any stage in the litigation.'" (quoting Arbaugh v. Y & H Corp., 546 U.S. 500, 506, 514 (2006)).

Federal courts are empowered to grant a writ of habeas corpus to a petitioner if, among other reasons, she is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3); see also 28 U.S.C. § 2254(a) (providing federal courts authority to consider habeas petitions filed by state prisoners who allege they are "in custody in violation of the Constitution or laws or treaties of the United States" pursuant to a state court judgment).  No allegations in the petition plausibly suggest that either Ms. Stephens or her minor child is "in custody" as that phrase has been construed by the United States Supreme Court.  In Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502, 503 (1982), the Supreme Court considered the question of "whether the habeas corpus statute, 28 U.S.C. § 2254, confers jurisdiction on the federal courts to consider collateral challenges to state-court judgments involuntarily terminating parental rights."  The petitioner in Lehman challenged the validity of the

4

37

state law under which her parental rights were terminated and sought an order directing the state to release her children to her custody "unless within 60 days an appropriate state court judicially determined that the best interest of the children required that temporary custody remain with the [s]tate." Id. at 505-06. The Lehman Court discussed prior cases broadly construing the meaning of "in custody," and acknowledged that through those cases "the scope of the writ of habeas corpus has been extended beyond that which the most literal reading of the statute might require." Id. at 508-10. But the Lehman Court reasoned that "extending the federal writ to challenges to state child-custody decisions—challenges based on alleged constitutional defects collateral to the actual custody decision—would be an unprecedented expansion of the jurisdiction of the lower federal courts." Id. at 512 (footnote omitted). The Lehman Court further reasoned that

> [t]he considerations in a child-custody case are quite different from those present in any prior case in which this Court has sustained federal-court jurisdiction under § 2254. The federal writ of habeas corpus, representing as it does a profound interference with state judicial systems and the finality of state decisions, should be reserved for those instances in which the federal interest in individual liberty is so strong that it outweighs federalism and finality concerns. Congress has indicated no intention that the reach of § 2254 encompass a claim like that of petitioner. We therefore hold that § 2254 does not confer federal-court jurisdiction.

Id. at 515-16 (footnote omitted); see also Roman-Nose v. N.M. Dep't of Human Servs., 967 F.2d 435, 436 (10th Cir. 1992) (citing Lehman for the proposition that "[a] state-court judgment involuntarily terminating parental rights cannot be collaterally attacked by way of a habeas corpus petition"); Zamora Trevino v. Barton, 727 F. Supp. 589, 591 (D. Kan. 1989) (citing Lehman and acknowledging that "the United States Supreme Court has refused to extend federal court jurisdiction to issue writs of habeas corpus in traditional challenges to state courts' child custody

orders").[3]  Even accepting Ms. Stephens's allegations as true, they are not sufficient to establish

that this Court has subject matter jurisdiction to consider her requests for federal habeas relief

under § 2241.  The Court thus finds that the petition, and this habeas action, shall be dismissed

without prejudice for lack of subject matter jurisdiction.[4]

### III.

Further, to the extent Ms. Stephens asks this Court to consider § 1983 claims arising from

alleged violations of her federally protected rights, she cannot initiate a civil rights action by

including § 1983 claims in a habeas petition.  Section 1983 provides a cause of action against

"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any

State . . . subjects, or causes to be subjected, any citizen of the United States or other person within

the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws."  42 U.S.C. § 1983; see, e.g., Wise v. Bravo, 666 F.2d 1328, 1332 (10th

Cir. 1981) (acknowledging that "[t]he state's power to legislate, adjudicate and administer all

aspects of family law, including determinations of custodial and visitation rights, is subject to

scrutiny by the federal judiciary within the reach of the Due Process and/or Equal Protection

Clauses of the Fourteenth Amendment").  And federal courts have jurisdiction over civil actions

seeking relief under § 1983.  See 28 U.S.C. §§ 1331, 1343.  But a federal habeas proceeding under

§ 2241 is a special civil proceeding wherein a person who is unlawfully detained by state or federal

---

[3] As previously stated, Ms. Stephens seeks relief under § 2241, not § 2254.  But, like the petitioner in Lehman, Ms. Stephens challenges state court orders relating to child custody.  Dkt. # 2, generally.  The Court thus finds that Lehman precludes this Court's exercise of federal habeas jurisdiction despite Ms. Stephens's decision to seek relief under § 2241 rather than under § 2254.

[4] To the extent this order constitutes a final adverse order entered against Ms. Stephens in a habeas proceeding, the Court declines to issue a certificate of appealability under 28 U.S.C. § 2253 because the lack of subject matter jurisdiction constitutes a plain procedural bar.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

6

authorities can file a petition in federal court to challenge that detention upon payment of a minimal ($5) filing fee. In contrast, a civil action under § 1983 is an ordinary civil proceeding wherein any citizen can file a civil complaint in federal court to seek relief for alleged violations of her federal rights by state and local officials upon payment of more substantial ($405) filing and administrative fees. Here, Ms. Stephens invoked federal habeas jurisdiction by filing a habeas petition under § 2241, improperly included § 1983 claims in the petition, and paid only the $5 fee necessary to commence a federal habeas action. Dkt. ## 2, 3. For the reasons just discussed, Ms. Stephens has not alleged sufficient facts to establish federal habeas jurisdiction. Should Ms. Stephens wish to pursue any § 1983 claims, she may do so only through a new civil action by filing a civil complaint (not a habeas petition) and by paying the $405 fees.

**IT IS THEREFORE ORDERED** that the petition for writ of habeas corpus under 28 U.S.C. § 2241 (Dkt. # 2) is **dismissed without prejudice** for lack of subject matter jurisdiction, and a certificate of appealability is **denied**. This is a final order terminating this action and a separate judgment of dismissal shall be entered herewith.

**IT IS FURTHER ORDERED** that Ms. Stephens's motion to obtain electronic case filing rights for non-attorneys (Dkt. # 4) and the motion to dismiss filed by respondent Oklahoma Department of Human Services (Dkt. # 7) are **dismissed as moot**.

**DATED** this 22nd day of January, 2026.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **LINH TRAN STEPHENS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **Case No. 25-CV-0286-CVE-MTS** |
| | ) | |
| **STATE OF OKLAHOMA, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

**ORDER**

This closed civil action is before the Court on petitioner Linh Tran Stephens's amended two-part motion to reopen time to appeal and motion for relief from judgment under Federal Rule of Civil Procedure 60 (Dkt. # 19).[1] For the following reasons, the Court grants in part and denies in part the two-part motion.

**I.   Background**

This Court dismissed without prejudice petitioner's "hybrid emergency petition for writ of habeas corpus for [her minor child] pursuant to 28 U.S.C. § 2241, 28 U.S.C. § 1651, 12 O.S. § 1331, and for injunctive and declaratory relief under 42 U.S.C. § 1983 with request for permanent restraining order" (Dkt. # 2) on January 22, 2026, and entered a judgment of dismissal against her that same day. Dkt. ## 9, 10. The order and judgment were mailed to Stephens's South Carolina mailing address that was on file with the Clerk of Court. Id. On March 9, 2026, the Clerk of Court received as returned mail the copies of the order and judgment that had been mailed to Stephens nearly two months earlier. Dkt. # 11. The envelopes were marked "RTS" and had postage labels

---

[1] Only one defendant entered an appearance in this matter before the Court dismissed the case. See Dkt. # 6. That defendant did not respond to the amended motion, and the time to do so has expired.

describing the mail as "return to sender, attempted not known, unable to forward." Id. Because the Clerk of Court had no other mailing address for Stephens, the Clerk of Court changed her address to "address unknown." Id.

On April 9, 2026, Stephens filed a combined "Notice of Appeal to the United States Court of Appeals for the Tenth Circuit and Combined Emergency Motion to Reopen Time to File Notice of Appeal Pursuant to FED. R. APP. P. 4(a)(6) and Motion for Relief from Void Judgment Pursuant to FED. R. CIV. P. 60(b)(4) and 60(d)(3) for Fraud upon the Court." The Court directed the Clerk of Court to docket this document twice, first as a notice of appeal (Dkt. # 12) and second as a two part-motion (Dkt. # 13). The Clerk of Court also updated Stephens's address, using the new address she identified in the notice of appeal, and mailed to Stephens an appeal packet. The United States Court of Appeals for the Tenth Circuit docketed the appeal as Case No. 26-5040 and immediately abated the appeal pending this Court's ruling on the two-part motion. Dkt. ## 15, 16.

On April 10, 2026, Stephens filed an amended combined "Notice of Appeal to the United States Court of Appeals for the Tenth Circuit and Combined Emergency Motion to Reopen Time to File Notice of Appeal Pursuant to FED. R. APP. P. 4(a)(6) and Motion for Relief from Void Judgment Pursuant to FED. R. CIV. P. 60(b)(4) and 60(d)(3) for Fraud upon the Court" that was docketed as an amended notice of appeal (Dkt. # 18) and as an amended two-part motion (Dkt. # 19).[2]

## II.     Amended motion to reopen time to appeal

Stephens brought this civil action against the State of Oklahoma and various state and local entities, officials, and employees. Dkt. # 2. She had only thirty days after the entry of judgment,

---

[2] Because Stephens filed an amended two-part motion, the Court denies as moot the original two-part motion (Dkt. # 13).

2

or until February 23, 2026, to file a timely notice of appeal. FED. R. APP. P. 4(a)(1); 28 U.S.C. § 2107(a). And the filing of a timely notice of appeal is jurisdictional. Bowles v. Russell, 551 U.S. 205, 214 (2007); Alva v. Teen Help, 469 F.3d 946, 948 (10th Cir. 2006). Stephens filed the original notice of appeal on April 9, 2026, and the amended notice of appeal on April 10, 2026. Dkt. ## 12, 18. Because both were untimely, she asks this Court to reopen the time to appeal under Federal Rule of Appellate Procedure 4(a)(6). Dkt. # 19, at 8-10. Applying Rule 4(a)(6), the Court finds that Stephens's request to reopen the time to appeal should be granted. Rule 4(a)(6) permits a district court to reopen the time to appeal "only if all the following conditions are satisfied:"

> (A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

> (B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

> (C) the court finds that no party would be prejudiced.

FED. R. APP. P. 4(a)(6). This rule implements 28 U.S.C. § 2107(c) by authorizing district courts to reopen the thirty-day period for filing an appeal, for a brief fourteen-day period, when the would-be appellant lacked timely notice of the entry of a judgment or an order. 28 U.S.C. § 2107(c)(1)-(2); Hamer v. Neighborhood Hous. Servs. of Chicago, 583 U.S. 17, 25 (2007). In support of her request to reopen the time to appeal, Stephens declares, under penalty of perjury, that she first received notice of the entry of judgment either on March 23, 2026, through an email notification system she identifies as CourtListener related to a different habeas action (Case No. 25-CV-285) or on April 9, 2026, when she "went on to PACER website to look up" the instant case. Dkt. # 19, at 4-6, 28. Because she did not receive formal notice within twenty-one days after entry of

3

judgment, the Court finds that Stephens has satisfied the condition in subdivision (a)(6)(A).[3]  And, accepting as true that she received only informal notice of the entry of judgment on either March 23, 2026, or April 9, 2026, the Court finds that Stephens has satisfied the condition in subdivision (a)(6)(B) because she filed the notice of appeal within 180 days of entry of judgment.[4]  Lastly, the Court finds that no party would be prejudiced by reopening the time to appeal and that Stephens has thus satisfied the condition in subdivision (a)(6)(C).[5]  The Court therefore grants Stephens's amended two-part motion, in part, as to her request to reopen the time to appeal, reopens the time to file an appeal for fourteen days from the date of this order, and deems the amended notice of appeal (Dkt. # 18) timely filed.  See Parrish v. United States, 605 U.S. 376, 391 (2025) ("When a district court grants reopening to a litigant who has already filed a notice making his intent to appeal clear, no second notice of appeal is required.  Instead, the original notice relates forward to the date reopening is granted.").

---

[3] "Because Civil Rule 77(d) requires that notice of the entry of a judgment or order be formally served under Civil Rule 5(b), any notice that is not so served will not operate to preclude a reopening of the time to appeal under new subdivision (a)(6)(A)."  FED. R. APP. P. 4(a)(6), advisory committee's note to 2005 amendments.

[4] The condition in Rule 4(a)(6)(B) requires a finding that that Stephens filed the notice of appeal either "within 180 days after the judgment or order [was] entered or within 14 days after [she] receive[d] notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier."  FED. R. APP. P. 4(a)(6)(B) (emphasis added).  Here, the fourteen-day period would have been the earlier period, but "only formal notice of the entry of judgment or order under Civil Rule 77(d) will trigger the [14]-day period."  FED. R. APP. P. 4(a)(6), advisory committee's note to 2005 amendments.  Thus, Stephens satisfied this condition by filing the notice of appeal within 180 days of entry of judgment.

[5] The prejudice contemplated in Rule 4(a)(6)(C) "means some adverse consequence other than the cost of having to oppose the appeal and encounter the risk of reversal, consequences that are present in every appeal."  FED. R. APP. P. 4(a)(6), advisory committee's note to 1991 amendment.

### III.     Motion for relief from judgment

Stephens also seeks relief from the judgment under Federal Rule of Civil Procedure 60. Dkt. # 19 at 10-12.  She asserts that relief is warranted under Rule 60(b)(4) because the judgment is void, and under Rule 60(d)(3) based on fraud on the court.  Id.

The filing of a notice of appeal generally divests a district court of jurisdiction over a case except for certain collateral matters.  See Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); McKissick v. Yuen, 618 F.3d 1177, 1196 (10th Cir. 2010). Absent a remand, this Court lacks jurisdiction to grant Stephens's Rule 60 motion and vacate the judgment from which she has appealed.  Nonetheless, this Court has authority to entertain and deny the motion.  See Aldrich Enters., Inc. v. United States, 938 F.2d 1134, 1143 (10th Cir. 1991) ("Although it lacked jurisdiction to grant the Rule 60(b)(2) motion due to the appeal . . . the court was free to consider the motion, and the court could then either deny it on the merits, or the court could have notified us of its intention to grant the motion upon proper remand."); Aune v. Reynders, 344 F.2d 835, 841 (10th Cir. 1965) ("In ordinary civil cases the rule is that after an appeal has been taken the district court retains jurisdiction to consider and deny a Rule 60(b) motion and, if it indicates that it will grant the motion, the movant may then ask the Court of Appeals to remand the case so that the district court may act."); FED. R. CIV. P. 62.1(a) (providing court may deny motion for relief that court otherwise lacks authority to grant due to pending appeal).

Liberally construing Stephens's arguments, the Court finds no basis to grant relief under either Rule 60(b)(4) or Rule 60(d)(3).  "Rule 60(b)(4) applies only in the rare instance where a

judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 271 (2010). Stephens appears to allege that the judgment is void because it was entered in violation of her right to due process. She asserts that the Court dismissed her hybrid habeas petition/civil rights complaint "without affording her notice, without a jury trial, and without written findings of fact and conclusions of law." Dkt. # 19 at 10. Nothing in the record supports this assertion. Stephens commenced this action in June 2025 by filing the hybrid habeas petition/civil rights complaint and paying the fee necessary to commence a habeas action. Dkt. ## 2, 3. At case opening, Stephens provided the following mailing address: 1964 Ashley River Rd Ste B Unit 80112, Charleston, South Carolina 29407. Dkt. 2 at 1, 112. Stephens included an email address at the end of the pleading. Id. at 112. She also filed two motions "to obtain electronic case filing rights for non-attorneys." Dkt. # 4. But Stephens did not file a written consent form to receive service of pleadings another papers by email, as required by Local Civil Rule 17-1(f). Under that rule, a pro se party may provide the Clerk of Court and all parties with an email address at which service upon the pro se party can be made, but a pro se party who chooses to receive service by email must complete and file a written consent form that is readily available on the court's website. LCvR17-1(f). Because Stephens did not file written consent to receive service by email, the Clerk of Court and all parties served motions and other papers on Stephens by using the mailing address she provided. See FED. R. CIV. P. 5(b)(2)(C) (providing that a paper is served by . . . mailing it to the person's last known address—in which event service is complete upon mailing"). Until mail sent to Stephens was returned to the Clerk of Court on March 9, 2026 (nearly two months after entry of judgment), there was no suggestion in the case record that Stephens lacked notice of any court proceedings. To be fair, Stephens did not respond to the motion to

6

46

dismiss that was filed on August 5, 2025. Dkt. # 7. But, twenty-one days after that motion to dismiss was filed, Stephens filed proofs of service. Dkt. # 8. Nothing in the record suggests that Stephens then inquired about the status of her case or otherwise informed the Court that she had not received motions or other papers from the Clerk of Court or any party. Further Stephens did not file a notice of change of address, as required by Local General Rule 2-6 and Local Civil Rule 17-1(h). Rather, the Clerk of Court obtained a new address for Stephens, after her case was dismissed, only by reviewing the original notice of appeal. Dkt. # 12. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950). Under the circumstances of this case, the Court finds that serving motions and other papers on Stephens by mailing them to Stephens's last known mailing address was reasonably calculated to apprise Stephens of the progress of her case and to provide her an opportunity to present her objections before entry of judgment. Consequently, the Court concludes that no due process violation rendered the judgment void.

Rule 60(d)(3) permits a court to set aside a judgment that was obtained through fraud on the court. FED. R. CIV. P. 60(d)(3). But "a claim of fraud on the court is difficult to establish" and the party asserting fraud on the court must establish its existence by clear and convincing evidence. Thomas v. Parker, 609 F.3d 1114, 1120 (10th Cir. 2010). "Moreover,

> "fraud on the court," whatever else it embodies, requires a showing that one has acted with an intent to deceive or defraud the court. A proper balance between the interests underlying finality on the one hand and allowing relief due to inequitable conduct on the other makes it essential that there be a showing of conscious wrongdoing—what can properly be characterized as a deliberate scheme to defraud—before relief from a final judgment is appropriate . . . . Thus, when there is no intent to deceive, the fact that misrepresentations were made to a court is not

7

of itself a sufficient basis for setting aside a judgment under the guise of "fraud on the court."

United States v. Buck, 281 F.3d 1336, 1342 (10th Cir. 2002) (quoting Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267 (10th Cir. 1995)).  Stephens alleges a "systematic and coordinated pattern of conduct by Defendants, acting in concert with judicial officers, state agencies, and Bar card attorneys, as described in the Second Amended Federal Claims, constitutes a fraud upon the court vitiating the judgment." Dkt. # 19, at 11.  She then provides a list of what her "Second Amended Federal Claims documented with particularity," namely, "fabricated and false representations by DHS, CPS, and CSS agents to state and federal courts; forgery of signatures and submission of materially false statements to courts; coordination between judicial officers and opposing parties' attorneys; illegal garnishment of ERISA-protected 401(k) retirement accounts; revocation of Plaintiff's passport in violation of her fundamental right to travel; RICO enterprise conduct among judicial actors, bar card attorneys, and state agencies; [and] forced debtor's prison/contempt proceedings in violation of constitutional prohibitions." Id. at 11-12.  It is not clear to this Court which, if any, of these allegations refer to the proceedings in this case because Stephens did not file any "Second Amended Federal Claims" in this case.[6]  Regardless, because Stephens presents nothing beyond conclusory allegations in her attempt to establish fraud on the court, the Court concludes there is no basis to grant relief from judgment under Rule 60(d)(3).

For these reasons, the Court denies the amended two-part motion, in part, as to the motion for relief from judgment under Federal Rule of Civil Procedure 60.

---

[6] Stephens appears to be referring to a document she filed in a different civil action that was entitled "Second Amended Federal Claims, Injunctive Relief." See Dkt. # 19, at 4 (referencing Stephens's July 30, 2025, filing of "Second Amended Federal Claims (Document 19) in Case No. 25-CV-0322-SEH-JFJ").

8

**IT IS THEREFORE ORDERED** that petitioner Linh Tran Stephens's amended two-part motion (Dkt. # 19) is **granted in part**, as to the motion to reopen time to appeal under Federal Rule of Appellate Procedure 4(a)(6), and **denied in part**, as to the motion for relief from judgment under Federal Rule of Civil Procedure 60.  Stephens's original two-part motion (Dkt. # 13) is **denied as moot**.

**IT IS FURTHER ORDERED** that the period to file an appeal is **reopened** for fourteen days from the date of this order and the amended notice of appeal (Dkt. # 18) is deemed timely.

**IT IS FURTHER ORDERED** that the Clerk of Court shall **send**, electronically, a copy of this order to the United States Court of Appeals for the Tenth Circuit, regarding **Case No. 26-5040**.

**DATED** this 18th day of May, 2026.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

9

**49**

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LINH TRAN STEPHENS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **Case No. 25-CV-0286-CVE-MTS** |
| | ) | |
| **STATE OF OKLAHOMA, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## ORDER

This closed civil action is before the Court on petitioner's motion for leave to appeal in forma pauperis. Dkt. # 22. Petitioner seeks leave to appeal, in Case No. 26-5040, without prepayment of the $605 appellate docketing and filing fees. Id. "[T]o succeed on [t]his motion, [petitioner] must show a financial inability to pay the required filing fees and the existence of a reasoned, nonfrivolous argument on the law and facts in support of the issues raised on appeal." DeBardeleben v. Quinlan, 937 F.2d 502, 505 (10th Cir. 1991). Based on representations in the motion for leave to appeal in forma pauperis, the Court finds that petitioner lacks sufficient funds to prepay the required fees. Nonetheless, the Court finds nothing in the notice of appeal or any other portion of the record to suggest "the existence of a reasoned, nonfrivolous argument on the law and facts" that petitioner could present on appeal. The Court therefore denies the motion for leave to appeal in forma pauperis. On or before June 18, 2026, petitioner shall either: (1) pay the $605 appellate docketing and filing fees to the Clerk of Court for the district court or (2) renew her request to proceed without prepayment of the fees by filing a motion for leave to appeal in forma pauperis in the United States Court of Appeals for the Tenth Circuit, in accordance with Federal Rule of Appellate Procedure 24(a)(5).

**IT IS THEREFORE ORDERED** that petitioner's motion for leave to appeal <u>in forma</u> <u>pauperis</u> (Dkt. # 22) is **denied**. On or before **June 18, 2026**, petitioner shall either (1) **pay** the $605 appellate docketing and filing fees to the Clerk of Court for the district court or (2) **file** a motion for leave to appeal <u>in forma pauperis</u> in the United States Court of Appeals for the Tenth Circuit, in accordance with Federal Rule of Appellate Procedure 24(a)(5).

**IT IS FURTHER ORDERED** that the Clerk of Court shall **send**, electronically, a copy of this order to the United States Court of Appeals for the Tenth Circuit, regarding **Case No. 26-5040**.

**DATED** this 19th day of May, 2026.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

2

# *VERIFIED* DECLARATION OF LINH TRAN STEPHENS
*(28 U.S.C. § 1746)*

I, Linh Tran Stephens, owner of LINH TRAN STEPHENS©™ and of G.L.S.©®, am a living woman upon the land not subject to statutory adhesion or administrative presumption, appearing sui juris and competent and in full capacity to testify, solemnly declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct to the best of my personal knowledge, records, belief, and understanding:

### A. Identity, Standing, and Relationship to the Child G.L.S.)

1. I am the appellant and the biological mother of my firstborn female offspring G.L.S. (born in 2013). I am a natural, living, free woman possessing a living soul and the Holy Spirit, serving faithfully as an Ambassador of YHWH (יהוה), an Heir of the Creator, and a High Royal Priest in the Order of Melchizedek pursuant to 1 Peter 2:9 and Hebrews 7:17. I am a Vietnamese national of the Asian continent, and subsequently also a naturalized American national, an honorably discharged veteran of the United States Navy who served as a medical officer with the rank of Lieutenant (O-3) from 2010 to 2015, and a primary-care physician (D.O.).

2. I have been G.L.S.'s primary caregiver since her birth, and I have personally provided for all of her essential needs—including food, shelter, schooling, and comprehensive medical and dental care—throughout her entire life.

3. I am a fit, safe, and non-abusive parent. The offspring ("**child**") of my current second marriage has remained continuously safe and thriving in my care, and treating medical professionals explicitly attest that I am alert, fully oriented, and possess complete mental capacity. I have no criminal record.

4. The biological father of G.L.S. is Adam Sylvester Stephens, my long-divorced ex-husband. Our divorce was finalized in 2016 by a lawful court order in the state of Oregon, which marked the dissolution of his fifth failed marriage. The biological father has a heavily documented history of abuse and neglect toward G.L.S. spanning multiple states across the United States including Oregon and Oklahoma. Despite the State of Oklahoma's current custodial infringement/interference upon me, even the biological father Adam has formally and legally admitted to my fitness as a parent, as set forth in detail in Paragraph 21 of this affidavit.

5. My custody of G.L.S. was established by a *January 8, 2016 Oregon decree of dissolution* (Columbia County, Oregon, Case No. 15DR18623), which granted 50/50 joint legal and physical custody with "unhampered access" and resolved

support by "Jeep and Trailer in lieu of child support" That decree was registered and adopted without modification into Tulsa County Case No. FD-2015-2228 on *July 11, 2017* (OSCN Document No. 1037428505) to be enforced. Oregon entered the controlling custody determination and retained jurisdiction; I have <u>not</u> ever moved to modify custody or child support.

6. I have never abandoned G.L.S. I have continuously sought to restore our relationship, contact, custody, and family bond.

**B. December 03, 2021 Removal and Continuing Separation due to OKDHS**

7. On *December 03, 2021*, the State of Oklahoma removed my child, G.L.S., from her private school via an *ex parte* order in the absolute absence of any exigent circumstances, medical emergency, or physical injuries to the child and placed her in "traditional foster home". At the time of the removal, a valid, active protective order against the biological father (Case No. PO-2021-3843) was already in place. This protective order had been obtained by the child herself, as well as by me on the child's behalf, to ensure her safety and to fulfill my maternal duty to protect her. This legal protective order preceded any Department of Human Services (DHS) involvement that year. The State subsequently transferred her from foster home into the custody of the very father from whom the protective order was meant to shield her.

8. There was no emergency warranting state intervention: On day of the removal, G.L.S. had spent an ordinary ten-hour day at school; her teachers and the school director, who possess twenty to thirty years of educational experience, observed her to be happy, healthy, and safe; no school official or mandatory reporter contacted child-welfare authorities while G.L.S. was under my care.

9. I did not consent to the removal of my firstborn female offspring, nor have I ever agreed to the State's continuous, forced separation of G.L.S. from me.

10. On *December 7–8, 2021*, my former attorneys, Erica Parks and Dale Warner, purported to waive my fundamental rights. They took this action entirely without my knowledge, without my informed consent, and in direct contravention of my express instructions. Immediately upon witnessing clear and convincing evidence of fraud upon the court, I terminated all legal counsel on *June 1, 2022*.

11. When I subsequently requested copies of the documents I had supposedly executed in the juvenile proceeding, my former attorney, Erica Parks, responded via email on *May 11, 2022*, stating: 'This is the only document you signed in JD court.' The single document referenced by my former counsel was not a waiver, a stipulation, a consent to placement, an admission of deprivation, or a surrender of my parental rights; rather, it was strictly a generic *Notice of*

*Rights/Directive*. I was not permitted to read, examine, or meaningfully review that document until months after it was executed.

12. I have been entirely deprived of meaningful contact with G.L.S. since *December 03, 2021*, and I cannot afford her ransom fees since *May 2024*. This forced, continuous separation causes ongoing, irreparable injury to both my child and me.

13. Following the removal of G.L.S., the scheduled hearings were repeatedly delayed and postponed for approximately nine months, despite my persistent demands for due process and the immediate return of my offspring. During that nine-month period, OKDHS completely deprived me of normal biological mother-daughter contact, explicitly denying me phone calls, video calls, and unrestricted visitation with my female offspring.

14. OKDHS subsequently restricted me to supervised visitation only, imposing an hourly fee of approximately $150. Over a five-year period, my contact was limited to a total of roughly thirty hours. These visits were monitored exclusively by court-selected supervisors through Family Visitation & Solutions, LLC (specifically Cheryl Hall), despite my persistent requests for neutral and free monitors; under her supervision, I was strictly forbidden from photographing my female offspring, voice-recording our interactions, or discussing my Christian faith with her. I was explicitly warned by staff that any objection on my part would result in the immediate termination of all visitation, which would then require months to restart.

15. During one specific visitation session, the OKDHS supervisor, Cheryl Hall, threatened that if I continued to teach G.L.S. about the 'Armor of God'—a Christian scriptural teaching from the Book of Ephesians—she would permanently end all of my visits. I responded to her that I would see my daughter when I see her, but that I would no longer accept the unlawful restriction of my religious freedom. On a separate occasion the same supervisor forbade me to sit next to G.L.S. on a merry-go-round at Incredible Pizza, so that we could not talk to or embrace one another. These restrictions burdened my and my female offspring's free exercise of religion, freedom of speech, and right to family association.

### C. False DHS Substantiation and Lack of Due Process

16. The Oklahoma Department of Human Services (OKDHS) issued a formal administrative finding under Referral No. 2195835, 'substantiating' allegations of abuse against me and naming me as the perpetrator by applying the agency's low 'some credible evidence' standard.

17. I received notice of that adverse finding only after the fact, via mail. The only administrative review offered to me was a paper-only 'file review,' by their own

internal department, and the agency's standard form explicitly declared that I was 'not eligible to appeal' the substantiation while court action was pending.

18. Prior to branding me a child abuser through this formal finding, the agency provided me with no hearing, no opportunity to confront or cross-examine the witnesses against me, and no neutral decision-maker.

19. I declare that this abuse substantiation was factually false and stands directly contradicted by contemporaneous photographic and video evidence captured during the home visit, as well as by seven reliable witness affidavits timely submitted to OKDHS. These seven exonerating affidavits included formal statements from licensed child psychologist Jim Lovett, school director Jayme Wingo-Martin, classroom teacher Susie Panzer, and neighbor and nurse practitioner Jeri Townsend.

20. I have never abused, neglected, endangered, kidnapped, sexually abused, sexually exploited, mentally abused, physically abused, or otherwise harmed my female offspring, G.L.S. To my knowledge, no competent medical report, forensic report, sexual-abuse examination, psychological evaluation, physician report, therapist report, school report, police report, or other professional evidence has ever established that I physically abused, sexually abused, mentally abused, neglected, endangered, exploited, kidnapped, or failed to protect my daughter. No medical provider has ever diagnosed my daughter as having been physically injured by me all her 8.5 years of life prior to OKDHS removal. Furthermore, no sexual-abuse examiner, forensic interviewer, police officer, physician, nurse, school official, or competent professional has ever produced admissible evidence that I sexually abused, sexually exploited, or exposed my daughter to pornography or child pornography.

21. The opposing party, the biological father, has formally and legally admitted to my fitness as a parent. Specifically, in *Requests for Admission* filed by the father on *October 5, 2017* (OSCN Document No. 1038420017), which were subsequently deemed admitted by Court Order on *November 28, 2017* (OSCN Document No. 1038854849), the father judicially admitted that I am 'a fit and proper parent to be awarded sole custody' and that awarding sole custody to me is in the best interest of G.L.S.

### D. Protective Reports I Made Before the Removal

22. Long before OKDHS removed my child, I actively made a protective report regarding her safety to the courts, which completely preceded any adverse findings against me. These include: Emergency Order of Protection was granted (11/24/2021) after filing it 11/23/2021 afternoon; Owasso Police Report No. 2021-2553; Tulsa Police Report No. 2021-060000 (both police reports dated *11/23/2021*); OKDHS Referral No. 2199067 (dated *11/29/2021*); OKDHS

Referral No. 2078246; and independent mandatory report (OKDHS Referral No. 2200561) filed against biological father by Jeri Townsend, APRN.

23. I declare that the timing of the Oklahoma state's allegations against me demonstrates a clear retaliatory motive, as no administrative or legal action was ever pursued against me until after I actively filed for emergency legal protection regarding my daughter's safety. I therefore aver that these cross-allegations were deliberately manufactured, accelerated, and coordinated by state actors to secure a tactical advantage, effectively discrediting my status as a protective mother before I could obtain discovery, cross-examine witnesses, or expose the fraudulent nature of the agency's claims. It took Oklahoma Department of Human Services officials exactly fifteen days—from November 23, 2021, through December 08, 2021—to completely invert the record, suppress the true evidence of child abuse, and flip the narrative against me. To protect the abusive father, Adam Stephens, state actors fabricated a shifting narrative: initially manufacturing a story that I forced my daughter to watch a PG-13 film (*'Taken'*) containing a rape scene, which they mutated days later into an R-rated film allegation, and ultimately escalated during the CPS Safety Meeting into a fraudulent claim of 'child pornography.' Despite these severe, fabricated claims, agency officials flatly refused my explicit demands to involve the Federal Bureau of Investigation (FBI)—a refusal captured on the hidden audio recording and corresponding personal transcription of the December 07, 2021 DHS/CPS Safety Meeting[9], which is preserved and publicly available on the permanent record at www.LinhStephens.com, as all counsel and OKDHS representatives refused to have an official court transcriptionist present.

### E. Suppression of Exculpatory Evidence

24. *2020* OKDHS investigation—documented in the Report to the District Attorney 04K1003E, Referral No. 2078246, and Case No. 20652909—identified severe concerns regarding the biological father and zero concerns regarding me, the mother. An OKDHS supervisor, Shasta Miller, subsequently truncated and altered that official report to intentionally remove the allegations against the father. Former OKDHS caseworker Maria Chico explicitly testified to this fraudulent alteration under oath at the *June 1, 2022* hearing.

25. The State's own records identified the biological father—and not me—as the sole source of concern. Specifically, in OKDHS Referral No. 2078246 at pages 17, 22, and 24, the child's treating therapist of approximately four years, Jim Lovett, reported professional concerns that the father was 'grooming' G.L.S. and

---

[9] https://docs.google.com/document/d/16N6Y1UNwgFAPNkLo0UCF9wrA7g1JKOnh/edit?usp=sharing&ouid=103569627108539296421&rtpof=true&sd=true CPS Safety Meeting hidden recording & transcript

relayed the child's firsthand disclosures of inappropriate co-sleeping directly to OKDHS immediately. In that same referral record, school director Jayme Wingo-Baker reported documented neglect occurring strictly while G.L.S. was in the father's care ("every other week)—noting that the child arrived late, exhibited poor hygiene, wore dirty or weather-inappropriate clothing, and carried incomplete schoolwork—while reporting 'no concerns' regarding my care. Furthermore, the guardian ad litem, Stephen Hale, acknowledged within the record that he was 'not a trained or suitable professional to question [the] child regarding sexual abuse' and admitted he had never spoken with the child's treating therapist (OKDHS Referral No. 2078246, at 17, 22, and 24).

26. Caseworker Bridget O'Brien (also known as Bridget Kay Menser) flatly refused to review my electronic devices or to arrange for a formal forensic interview. Instead, she biasedly stated to me: 'I know you're guilty just by looking at you.' Caseworker O'Brien later admitted under oath, as documented on pages 98–99 of the *June 1, 2022* Transcript, that she examined no devices, saw zero pornography in my home, and that law enforcement explicitly declined to investigate; despite this total absence of evidence, she still 'substantiated' the abuse allegation against me. I am aware that this caseworker holds a prior felony record under her maiden name in Tulsa County Case No. CF-1999-2911 for selling alcohol to minors.

27. Although I requested my complete OKDHS records repeatedly via all forms of communications, the agency systematically withheld all exculpatory records from me, providing only the final finding letter mailed on *April 23, 2022*. This deliberate denial of access to my own files left me entirely unable to meet, rebut, challenge, or cross-examine the allegations weaponized to remove my biological inheritance, my firstborn female offspring.

### F. No Knowing Waiver of Rights

28. I never knowingly, voluntarily, and intelligently waived my parental rights, due-process rights, right to notice, right to be heard, right to present evidence, right to discovery, right to confront and cross-examine witnesses, or right to challenge the allegations and documents used to remove my offspring from my safe protection, care, and covering.

29. Any alleged waiver, consent, stipulation, or agreement attributed to me without my knowing, voluntary, intelligent, and informed consent is hereby, again as always, expressly denied, revoked, rescinded, and objected to. I affirm that any signatures, verbal statements, or representations by former counsel that imply my consent to the state's custody or placement decisions were executed entirely without my authority and are completely void.

### G. Secret Meeting and Release to Father

30. On *December 08, 2021*, in the underlying juvenile matter (Case No. JD-2021-270), an off-the-record meeting was held among OKDHS Caseworker O'Brien, State's Attorney Jantz, and Judge Martha Rupp Carter. This meeting was conducted completely without notice to me or my legal counsel, and without the presence of a court reporter to log the proceedings. Immediately following this secret, ex parte meeting—for which there is zero transcript or recording—physical and legal custody of my child, G.L.S., was released directly to the biological father. This release of custody was executed despite the fact that G.L.S. had explicitly reported active child abuse and neglect perpetrated against her by that very father.

## H. Father's Conduct and Admissions

31. The biological father Adam Sylvester Stephens, Sr., also agreed on the record, before Judge Kevin Morrison, to the terms of a Conduct Order (titled *Petitioner's Motion for Order of Parental Conduct and Education*, OSCN Document No. 1048071356, filed *November 9, 2020*). Under this order, he explicitly stipulated to *cease sleeping naked in the same bed with G.L.S. and to stop other numerous documented parental misconducts/ child-abuses/ child-neglects*.

32. The biological father subsequently gave irreconcilable, conflicting sworn testimony regarding a protective order he had obtained against me, revealing a deliberate pattern of perjury and manipulation of the court process. At an evidentiary hearing on *July 24, 2023*, the father was actively and thoroughly impeached on the record for making demonstrably false statements and filing a fraudulent affidavit to secure that protective order. Following this explicit impeachment, and despite being presented with overwhelming contrary testimony and objective evidence that completely discredited his claims, the father testified under oath that he was completely unaware that filing a false protective order constitutes a criminal offense. When asked if he would retract his fraudulent petition in light of the exposure of his lies, the father defiantly stated that he would 'absolutely not' do so (Transcript of *July 24, 2023*, at page 209). He openly demonstrated a complete absence of remorse for lying under oath, showing total contempt for judicial integrity and the administration of justice. Conversely, at a subsequent hearing on *February 1, 2024*, the father admitted under oath that he had actually known 'for quite a while' that falsifying a protective order constitutes the crime of perjury (Transcript of *February 1, 2024*, at page 78).

## I. Guardian ad Litem and Judicial Bias

33. An earlier guardian ad litem assigned to the case, Valerie Blackstock, explicitly recommended in her formal report dated *August 9, 2018*, that I be awarded the

primary and greater share of custody rather than the current 50/50 arrangement. This recommendation was based directly upon the biological father's continuous, documented patterns of perjury, child abuse, and severe neglect. Following this objective recommendation in my favor, Guardian ad Litem Blackstock was summarily removed and replaced by a new guardian ad litem, Stephen E. Hale. This replacement was executed over my express, timely objections and was done in total absence of any disclosure regarding Stephen E. Hale's extensive, deep material conflicts of interest.

34. At a *July 24, 2023* hearing in the related state proceeding (Stephens v. Stephens), the presiding judge stated verbatim on the record: 'THE COURT: So I've let him answer your question about whether he's ever -- him or his firm has ever given me money, and he has. But for your reference I am not an elected Judge. So I don't have a campaign fund that anyone can contribute to.' (Transcript of *July 24, 2023*, at pages 97–98). During that same hearing, guardian ad litem Hale testified under oath that the biological father paid him to appear, that he billed at an hourly rate of $225 to $250, and that his billing infrastructure was engineered so that a parent's payments were reflected strictly on that individual parent's ledger (Transcript of *July 24, 2023*, at pages 38 and 40–44). Based upon these explicit disclosures of financial exchange and institutional bias, I moved multiple times for the presiding judge's recusal, which was summarily denied.

## J. ADA Violations

35. I am a qualified individual with documented disabilities, and I formally requested reasonable accommodations from the state courts under the Americans with Disabilities Act (ADA). The court systematically denied my protected requests, despite fictitiously approving them on paper to manufacture a false record of compliance. In practice, the court actively violated my civil rights by requiring my private disability diagnoses to be broadcast aloud in open court and flatly denying the private chamber setting my ADA advocate had formally requested. In direct retaliation for asserting my rights under the ADA, the court threatened to force me to undergo a punitive psychological evaluation despite no signs and symptoms of mental illness. Furthermore, the court refused to allow my ADA advocate to attend proceedings via video correspondence, despite explicitly permitting the opposing parties to appear virtually (Transcripts of *March 21, 2022*, at pages 4–5 and 10–11, and *March 24, 2023*).

## K. Kinship Placement and Reunification Failures

36. OKDHS completely failed to satisfy its statutory mandates regarding family preservation and placement preferences. The agency never provided me with

mandatory kinship-placement paperwork, despite the fact that I possess extensive family networks in Oklahoma and Texas, as well as a highly supportive church and neighborhood community. At no point were any reunification services ever offered to me by the agency.

37. I went to extraordinary lengths to compile and submit an extensive list of safe maternal relatives available for immediate placement, including my own mother and father, who affirmatively volunteered to provide full-time care and supervision. In complete disregard of these safe, preferred familial alternatives, OKDHS ignored my submitted list entirely and chose instead to place G.L.S. into a stranger foster care home.

## L. Title IV-E and Reasonable Efforts

38. The explicit judicial findings required by federal law before a child may be removed from a home and before federal funding may be drawn—specifically, that 'reasonable efforts' were made to prevent removal and that remaining in the home was 'contrary to the welfare' of the child—were never made in this case. Despite the total absence of these mandatory judicial findings, the State fraudulently and actively established a federal grant identifier for my case under Title IV-D (OK IV-D FGN 000948641001).

39. I have never received, nor was I ever informed of, any official Title IV-E eligibility determination regarding my female offspring, G.L.S. I am aware of no court finding executed at the time of removal establishing that my continued care would be 'contrary to the welfare' of G.L.S., or that the State made any 'reasonable efforts' whatsoever to prevent her removal from my care and custody.

## M. Ongoing Harm and Request for Relief

40. The unlawful deprivation of my offspring is active and ongoing. I have never consented to this separation, I have never consented to the termination or permanent restriction of my parental rights and first amendment rights, and I continue to actively seek full restoration with my firstborn female offspring.

41. The continued, forced separation of my female offspring from me, her biological mother—without meaningful contact and without a meaningful evidentiary hearing—constitutes a severe, ongoing violation of our fundamental parent-child liberty and constitutional rights.

42. I respectfully seek emergency relief returning G.L.S. to my physical and lawful care, protection, and Godly maternally covering.

## N. Reservation of Rights

43. I explicitly reserve the right to amend and supplement this Declaration immediately upon receiving my complete OKDHS/CPS file, the juvenile court file, the family court file, the guardian ad litem (GAL) file, all law enforcement

records, attorney files, ex parte communication logs, minute orders, proposed orders, internal agency email chains, system metadata, and all original source documents connected to the timeline spanning from *November 2021* through the present date.

44. I formally reserve any and all YHWH-given, unalienable, international, constitutional, statutory, common-law, equitable, appellate, habeas corpus, civil rights, parental rights, due process, equal protection, First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, Americans with Disabilities Act (ADA), and evidentiary rights. I do not waive any right, claim, or defense by executing and filing this Declaration.

## AVOUCHMENT / VERIFICATION

i hereby declare, verify, certify and affirm, pursuant to the penalties of perjury under the laws of the united states of America, and by the provision of **28 U.S. Code § 1746** that i am of sound mind and competent in full capacity to make this verification, and that all of the above and foregoing representations are true and correct to the best of my knowledge, information, belief.

Executed in <u>Newberry</u> County, republic land of <u>South Carolina</u> on this <u>26th</u> day of <u>June</u> in the Year of Our Lord <u>Two Thousand and Twenty Six</u>.

**Private autograph;**
**WITHOUT RECOURSE**



By: _____

Linh Tran Stephens / one-and-only Authorized Agent or attorney-in-fact and **Secured Party Creditor & TTEE of LEGAL ENTITIES LINH TRAN STEPHENS©™ and of G.L.S©® ens legis and derivatives thereof**

By the Holy and Eternal Authority vested in me by Yahusha Ha'Mashiach and as High Royal Priest (1 Peter 2:9) of Melchizedek Order (Hebrews 7:17), I do hereby seal, confirm, and sanctify this instrument and its contents as lawfully issued in all Heavens and upon the Earth,

## Notary as JURAT CERTIFICATE

state of Minnesota        )
                          ) *ss*
county of Sherburne       )

On this <u>26th</u> day of <u>June</u>, 20<u>26</u> before me, <u>Melissa K. Vagle</u>, a Notary Public, personally appeared a living woman <u>Linh Tran Stephens</u> ( the one-and-only <u>Authorized Representative for Legal Fiction LINH TRAN STEPHENS ©™</u> ),

known to me or proved to me on the basis of satisfactory evidence to be the <span style="color:red">woman</span> whose name is subscribed on this instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her autograph(s) on the instrument the woman executed, the instrument.

I certify under PENALTY OF PERJURY under the lawful laws of Minnesota State and that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Melissa K. Vagle*

Signature of Notary/Jurat

MELISSA K VAGLE
Notary Public
State of Minnesota
My Commission Expires
January 31, 2028